No. <u>26-1100</u>

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

APPALACHIAN VOICES, SOUTHERN ALLIANCE FOR CLEAN ENERGY,
7 DIRECTIONS OF SERVICE, and SIERRA CLUB,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

---

## JOINT PETITION FOR REVIEW

---

Pursuant to Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b), and Rule 15(a) of the Federal Rules of Appellate Procedure, Petitioners Appalachian Voices, Southern Alliance for Clean Energy, 7 Directions of Service, and Sierra Club (collectively, "Petitioners") hereby petition the Court to review and set aside the following orders of the Federal Energy Regulatory Commission ("Commission"):

1.  Order Issuing Certificate and Approving Abandonment, *Transcontinental Gas Pipe Line Company, LLC*, Dkt. No. CP25-10-000, 194 FERC ¶ 61,078 (Jan. 29, 2026) ("Certificate Order") (attached hereto as Exhibit A); and

2. Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Transcontinental Gas Pipe Line Company, LLC*, Dkt. No. CP25-10-001, 195 FERC ¶ 62,007 (April 2, 2026) ("Denial by Operation of Law") (attached hereto as Exhibit B).

These orders concern the Commission's issuance of a certificate of public convenience and necessity to Transcontinental Gas Pipe Line Company, LLC ("Transco") for the Southeast Supply Enhancement Project ("the Project"). The certificate authorizes Transco to construct and operate the Project. Petitioners and their members have been and will be aggrieved by the approval, construction, and operation of the Project. All Petitioners were intervenors before the Commission in the proceedings below and timely requested rehearing of the Certificate Order. The Commission issued its Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration on April 2, 2026. This Court has jurisdiction and this petition is timely under Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b).

In accordance with Rule 15(c) of the Federal Rules of Appellate Procedure, the list of parties served with copies of this Joint Petition for Review is attached as Exhibit C.

DATED: April 28, 2026                    Respectfully submitted,

/s/ Elizabeth Benson

Elizabeth Benson
D.C. Circuit Bar No. 56477
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5723
elly.benson@sierraclub.org

*Counsel for Appalachian Voices,
Southern Alliance for Clean Energy, 7
Directions of Service, and Sierra Club*

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |
|---|---|
| APPALACHIAN VOICES, SOUTHERN ALLIANCE FOR CLEAN ENERGY, 7 DIRECTIONS OF SERVICE, and SIERRA CLUB, | |
| *Petitioners*, | No. _____ |
| v. | |
| FEDERAL ENERGY REGULATORY COMMISSION, | |
| *Respondent*. | |

**CORPORATE DISCLOSURE STATEMENT**

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

**Appalachian Voices** works in partnership with local people and communities to defend the natural heritage and economic future of the Appalachian region. Appalachian Voices has no parent companies, and no publicly held company has a 10% or greater ownership interest in Appalachian Voices.

**Southern Alliance for Clean Energy** ("SACE") is a regional non-profit membership organization committed to promoting responsible and equitable energy choices to ensure clean, safe, and healthy communities throughout the

Southeast. SACE has no parent companies, and no publicly held company has a 10% or greater ownership interest in SACE.

**7 Directions of Service** ("7 Directions") is an Indigenous-led environmental justice and community organizing collective based on Occaneechi-Saponi homelands in rural North Carolina. 7 Directions has no parent companies, and no publicly held company has a 10% or greater ownership interest in 7 Directions.

**Sierra Club**, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment. Sierra Club has no parent companies, and no publicly held company has a 10% or greater ownership interest in Sierra Club.

DATED: April 28, 2026        Respectfully submitted,

*/s/ Elizabeth F. Benson*
Elizabeth F. Benson
D.C. Circuit Bar No. 56477
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5723
elly.benson@sierraclub.org

*Counsel for Appalachian Voices,*
*Southern Alliance for Clean Energy, 7*
*Directions of Service, and Sierra Club*

**CERTIFICATE OF SERVICE**

I certify that, on April 28, 2026, copies of this Joint Petition for Review and exhibits were served on all parties admitted to participate in the agency proceedings by email to the official service list in Federal Energy Regulatory Commission Docket Nos. CP25-10-000 and CP25-10-001. As required by Rule 15(c)(2) of the Federal Rules of Appellate Procedure, a list of those so served is attached as Exhibit C.

In accordance with D.C. Circuit Rule 15(a), I further certify that a copy of the foregoing was served by U.S. Postal Service mail to the following:

Debbie-Anne A. Reese, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E., Room 1A
Washington, DC 20426

A copy of the foregoing was also served by email to:

Robert Solomon, Solicitor
Federal Energy Regulatory Commission
888 First Street, N.E., Room 101-01
Washington, DC 20426
robert.solomon@ferc.gov

DATED: April 28, 2026            */s/ Elizabeth Benson*
                                 Elizabeth Benson
                                 Sierra Club

# Exhibit A

194 FERC ¶ 61,078
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Laura V. Swett, Chairman;
David Rosner, Lindsay S. See,
Judy W. Chang, and David LaCerte.

Transcontinental Gas Pipe Line Company, LLC            Docket No. CP25-10-000

ORDER ISSUING CERTIFICATE AND APPROVING ABANDONMENT

(Issued January 29, 2026)

1.      On October 29, 2024, Transcontinental Gas Pipe Line Company, LLC (Transco) filed an application pursuant to sections 7(b) and 7(c) of the Natural Gas Act (NGA)[1] and Part 157 of the Commission's regulations,[2] requesting authorization to construct and operate the Southeast Supply Enhancement Project in Pittsylvania County, Virginia; Rockingham, Guilford, Forsyth, Davidson, Iredell, Cleveland, Lincoln, and Gaston Counties, North Carolina; Anderson County, South Carolina; Walton and Henry Counties, Georgia; and Coosa County, Alabama (SSE Project).  The project is designed to provide up to 1,596,900 dekatherms per day (Dth/d) of firm transportation capacity.  For the reasons discussed below, we will grant the requested authorizations, subject to certain conditions.

I.      **Background and Proposal**

2.      Transco, a Delaware limited liability company, is a natural gas company as defined by section 2(6) of the NGA,[3] engaged in the transportation of natural gas in interstate commerce and subject to the Commission's jurisdiction.  Transco's transmission system extends from Texas, Louisiana, and the offshore Gulf of America area, through Mississippi, Alabama, Georgia, South Carolina, North Carolina, Virginia, Maryland, Pennsylvania, and New Jersey, to its termini in the New York City metropolitan area.

---

[1] 15 U.S.C. §§ 717f(b), (c).

[2] 18 C.F.R. pt. 157 (2025).

[3] 15 U.S.C. § 717a(6).

Document Accession #: 20260129-3076          Filed Date: 01/29/2026

3.       The proposed SSE Project is an expansion of Transco's existing natural gas transmission system that will enable Transco to provide 1,596,900 Dth/d of incremental firm transportation capacity from its existing Station 165 Zone 5 Pooling Point and the Cherrystone Interconnect with Mountain Valley Pipeline, LLC (MVP) in Pittsylvania County, Virginia, to natural gas markets in the southeast United States.  Transco states that the project will allow it to remove pipeline capacity constraints in its Zones 4 and 5 and to meet growing demand for natural gas-fired power generation, as well as for commercial, residential, and industrial use.

4.       Specifically, Transco proposes to:

- construct approximately 31.2 miles of 42-inch-diameter pipeline in Pittsylvania County, Virginia, and Rockingham County, North Carolina (Eden Loop);

- construct approximately 294 feet (ft) of 30-inch-diameter pipeline and ancillary valves in Rockingham County, North Carolina (Dan River Inlet Piping);

- construct approximately 24.1 miles of 42-inch-diameter pipeline in Guilford, Forsyth, and Davidson Counties, North Carolina (Salem Loop);

- install two new 33,000-horsepower (HP)[4] electric motor-driven) compressor units at Transco's existing Compressor Station 165 located in Pittsylvania County, Virginia;[5]

- install a new 23,465 HP Solar Titan 130 gas-fired turbine-driven and two new 31,871 HP Solar Titan 250 gas-fired turbine-driven compressor units at Transco's existing Compressor Station 155 located in Davidson County, North Carolina;[6]

---

[4] All the horsepower for the project is International Standardization Organization (ISO) rated.  ISO-rated power is measured and specified according to the standard reference conditions defined by the International Organization for Standardization: 59 degrees Fahrenheit (°F) ambient temperature, 60% relative humidity, and sea level elevation.

[5] Compressor Station 165 will be limited to a total incremental horsepower of 45,000, thereby increasing the total certificated station horsepower from 51,930 to 96,930.

[6] Compressor Station 155 will have a total incremental horsepower of 87,207,

Docket No. CP25-10-000                                                          - 3 -

- install a new 15,900 HP Solar Mars 100 gas-fired turbine-driven compressor unit at Transco's existing Compressor Station 150 located in Iredell County, North Carolina;[7]

- install regulator facilities in Rockingham County, North Carolina, near milepost 1382.5 (Eden Regulator Station);

- abandon three 12,500-HP electric motor-driven compressor units at Transco's Compressor Station 145 located in Cleveland County, North Carolina, and replace them with three new 33,000-HP electric motor-driven compressor units;[8]

- modify valve controls at existing mainline valve setting145B21 in Lincoln County, North Carolina;

- modify valve controls at existing mainline valve setting 145B20 in Gaston County, North Carolina;

- modify piping at Transco's existing Compressor Station 135 in Anderson County, South Carolina, to make the station bi-directional;

- modify piping at Transco's existing Compressor Station 125 in Walton County, Georgia, to make the station bi-directional;

- install regulator facilities and modify piping at Transco's existing Compressor Station 120 in Henry County, Georgia, to make the station bi-directional; and

- modify piping at Transco's existing Compressor Station 105 in Coosa County, Alabama, to make the station bi-directional.

5.    As stated above, Transco proposes to abandon three compressor units at Compressor Station 145 because it states that the units are obsolete and difficult to maintain and operate.  Transco proposes to replace the three 12,500-HP units with three

---

thereby increasing the total certificated station horsepower from 23,502 to 110,709.

[7] Compressor Station 150 will have a total incremental horsepower of 15,900, thereby increasing the total certificated station horsepower from 61,930 to 77,830.

[8] Compressor Station 145 will have a total incremental horsepower of 61,500, thereby increasing the total certificated station horsepower from 37,500 to 99,000.

Document Accession #: 20260129-3076          Filed Date: 01/29/2026

33,000-HP units in order to increase the station's certificated capacity and provide the incremental compression required for the project.

6.      Transco states that it held a non-binding open season and reverse open season from June 19, 2023, through July 14, 2023.[9]  Transco did not receive any offers to relinquish capacity.  Following the open season, Transco executed ten precedent agreements for 100% of the project's capacity with:  Duke Energy Carolinas, LLC (Duke Energy) for 1,000,000 Dth/d; Southern Company Services, Inc. for 400,000 Dth/d; South Carolina Public Service Authority for 80,000 Dth/d; Atlanta Gas Light Company for 75,000 Dth/d; Patriots Energy Group for 14,000 Dth/d; Greer Commission of Public Works for 10,000 Dth/d; The City of Fountain Inn for 2,400 Dth/d; Municipal Gas Authority of Georgia for 2,000 Dth/d; City of Wilson for 2,000 Dth/d; City of Danville for 1,500 Dth/d; Fort Hill Natural Gas Authority for 5,000 Dth/d; and Southwestern Virginia Gas Company for 5,000 Dth/d.

7.      Transco will provide the project capacity along the following paths:

- 1,500 Dth/d from Transco's Station 165 Zone 5 Pooling Point and the Cherrystone Interconnect with MVP to Transco's existing Danville Meter Station located in Pittsylvania County, Virginia;

- 5,000 Dth/d from Transco's Station 165 Zone 5 Pooling Point and the Cherrystone Interconnect with MVP to Transco's existing Martinsville Meter Station located in Pittsylvania County, Virginia;

- 300,000 Dth/d from Transco's Station 165 Zone 5 Pooling Point and the Cherrystone Interconnect with MVP to Transco's existing Eden Meter Station, Transco's existing Dan River #2 Meter Station, and Transco's existing Cardinal Meter Station, all in Rockingham County, North Carolina;

- 2,000 Dth/d from Transco's Station 165 Zone 5 Pooling Point and the Cherrystone Interconnect with MVP to Transco's existing Reidsville Meter Station located in Rockingham County, North Carolina; and

- 1,288,400 Dth/day from Transco's Station 165 Zone 5 Pooling Point and the Cherrystone Interconnect with MVP to Transco's existing Station 85 Zone 4 Pooling Point located in Choctaw County, Alabama.

---

[9] Application at 18.

8.      Transco estimates the total cost of the project to be approximately $1.527 billion.[10] It proposes to render firm transportation service for the project under its Rate Schedule FT of its FERC Gas Tariff.  Transco proposes an incremental recourse rate designed to recover the cost of service attributable to the incremental project facilities.  The project shippers elected to pay negotiated rates.

9.      On January 8, 2025, Southern Alliance for Clean Energy, Appalachian Voices, and 7 Directions of Service (Environmental Groups) filed an objection to the confidentiality agreement included as part of Transco's application pursuant to section 388.112 of the Commission's regulations, which outlines the procedure to request privileged treatment for information filed with the Commission.[11]  On March 5, 2025, the Commission issued an order directing Transco to revise its confidentiality agreement, and Transco filed a revised confidentiality agreement on March 12, 2025.

## II.     **Notice, Interventions, and Comments**

10.     Notice of the application was published in the *Federal Register* on November 18, 2024,[12] establishing December 3, 2024, as the deadline for filing interventions, comments, and protests.  A number of timely, unopposed motions to intervene were filed.[13]  Several late motions to intervene were also filed.  Ms. Aleksandra Gill's and Mr. Ankoma Anderson's late motions to intervene were granted,[14] and the North Carolina Farm Bureau Federation's and Southern Company Services, Inc.'s late motions to intervene were denied.[15]

11.     The Commission also received comments both in support of and opposed to the project.  Commenters in support of the project generally state that it is needed to bring more natural gas to the region, alleviate constraints, support economic development, and

---

[10] *Id.* Ex. K at 2.

[11] *See* Environmental Groups January 8, 2025 Objection (citing 18 C.F.R. § 388.112 (2025)).

[12] 89 Fed. Reg. 90686 (Nov. 18, 2024).

[13] Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure.  18 C.F.R. § 385.214(c) (2025).

[14] January 14, 2025 Notice Granting Late Intervention; April 10, 2025 Notice Granting Late Intervention.

[15] April 10, 2025 Notice Denying Late Intervention; June 6, 2025 Notice Denying Late Intervention.

provide reliability.  Commenters opposed to the project question whether there is a market need for the project and are concerned with the cost to ratepayers.  Commenters also raised concerns about the project's environmental impacts.  Transco filed an answer to several of the protests.[16]  Although the Commission's Rules of Practice and Procedure do not permit answers to protests, we find good cause to waive our rules and accept the answer because it provides information that has assisted in our decision-making process.[17]  The concerns raised by commenters are addressed in the Environmental Assessment (EA) issued for the project and, as appropriate, below.

## III.    Procedural Issues

### A.      Request to Extend Intervention and Comment Period

12.     Several comments requested that the Commission extend the intervention and public comment period for 60 days to allow the public more time to review Transco's application and provide informed feedback.[18]  The comment period for the application was consistent with the Commission's practice of providing a 21-day comment period for applications filed pursuant to section 7 of the NGA.  The 21-day comment period is adequate and consistent with the Commission's standard practice, and we therefore find no reason to extend it.

### B.      Request for an Evidentiary Hearing

13.     Sierra Club, Southern Alliance for Clean Energy, Appalachian Voices, and 7 Directions of Service (collectively, Sierra Club) requests an evidentiary hearing of Transco's application to assess project alternatives,[19] but does not provide any additional information regarding this request.

14.     An evidentiary, trial-type hearing is necessary only where there are material issues of fact in dispute that cannot be resolved on the basis of the written record.[20]  Sierra Club

---

[16] Transco December 18, 2025 Answer.

[17] *See* 18 C.F.R. § 385.213(a)(2) (2025).

[18] *See, e.g.*, Piedmont Environmental Alliance December 3, 2024 Comment at 1; Good Stewards of Rockingham December 3, 2024 Comment at 1; National Wildfire Federation December 3, 2024 Comment at 1.

[19] Sierra Club December 3, 2024 Comment at 3.

[20] *See, e.g.*, *S. Union Gas Co. v. FERC*, 840 F.2d 964, 970 (D.C. Cir. 1988); *Dominion Transmission, Inc.*, 141 FERC ¶ 61,183, at P 15 (2012).

has not raised any such issues. As demonstrated by the discussion below, the existing written record provides a sufficient basis to resolve the issues relevant to this proceeding. The Commission has satisfied the hearing requirement by giving all interested parties a full and complete opportunity to participate through an evidentiary submission in written form.[21] Therefore, we deny Sierra Club's request for an evidentiary hearing.

### C.   Motion to Lodge

15.    On December 22, 2025, Southern Alliance for Clean Energy, Appalachian Voices, 7 Directions of Service, Katie Whitehead, and Robert McNutt filed a joint motion to lodge a report prepared by Greenlink Analytics and Science for Georgia that examines the impacts of projected data center growth on power demand in the Southeast. On December 29, 2025, Transco, and on January 5, 2026, Duke Energy filed answers opposing the motion to lodge.

16.    The report was filed over a year after the close of the comment period established by the Notice of Application,[22] but the movants offer no justification for why their filing was so delayed. Because the unsupported motion was made at an extremely late stage of the proceeding, we deny the motion to lodge. Accordingly, we do not consider the answers filed by Transco and Duke Energy.

## IV.   Discussion

17.    Because Transco's proposed facilities will be used to transport natural gas in interstate commerce subject to the Commission's jurisdiction, the proposal is subject to the requirements of subsections (c) and (e) of section 7 of the NGA.[23] In addition, Transco's proposed abandonment of pipeline facilities is subject to the requirements of section 7(b) of the NGA.[24]

### A.   Certificate Policy Statement

18.    The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[25] The Certificate Policy Statement establishes criteria for

---

[21] *Moreau v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993).

[22] The report was also filed outside of the comment period established for the EA, *infra* P 52, and we note that the filing does not offer any comments on the EA.

[23] 15 U.S.C. §§ 717f(c), (e).

[24] *Id.* § 717f(b).

[25] *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227,

determining whether there is a need for a proposed project and whether the proposed project will serve the public interest. It explains that, in deciding whether and under what terms to authorize the construction of new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences. The Commission's goal is to appropriately consider the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

19.     Under this policy, the threshold requirement for applicants proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers. The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, and landowners and communities affected by the route of the new pipeline facilities. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects. This is essentially an economic test. Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis, where other interests are considered.

### 1.    No Subsidy Requirement

20.     The threshold requirement for applicants proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers. The Commission has determined that, in general, when a pipeline proposes an incremental rate for service utilizing proposed expansion capacity that is higher than the generally applicable system rate, the pipeline satisfies the threshold requirement that the project will not be subsidized by existing customers.[26] In instances where an incremental rate calculated to recover project costs is less than the existing system rate, Commission policy requires that the system rate should be used as the initial recourse rate to ensure existing customers will not subsidize the new service.[27]

---

corrected, 89 FERC ¶ 61,040 (1999), clarified, 90 FERC ¶ 61,128, further clarified, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

[26] See, e.g., Dominion Transmission, Inc., 155 FERC ¶ 61,106, at P 15 (2016); Transcon. Gas Pipe Line Corp., 98 FERC ¶ 61,155, at 61,552 (2002).

[27] E.g., Tex. Gas Transmission, LLC, 152 FERC ¶ 61,160, at P 30 (2015);

21.     As discussed below, Transco initially proposed an incremental recourse rate to recover the costs attributable to the expansion component of the project which is higher than Transco's existing system rate.  Following a new settlement affecting Transco's system rates, Transco revised the incremental rate for the project such that the incremental rate is now lower than the system rate;[28] we therefore direct Transco to use the system rate contained in the settlement as the project recourse rate for the expansion capacity, as explained further below.  Accordingly, with respect to the expansion costs, we find there will be no subsidization of the project by Transco's existing customers.  With respect to the costs attributable to the replacement component of the project, the Commission has determined that it is not a subsidy under the Certificate Policy Statement for existing customers to pay for projects designed to improve the reliability or flexibility of existing services.[29]  The compressor station upgrades allocated to the replacement component of the project are designed to increase reliability and lower operation and maintenance costs of Transco's existing system.  Therefore, we find that Transco's proposal will not result in subsidization of the project by Transco's existing customers.

### 2.     Project Need

22.     Transco states that the SSE Project is designed to meet growing natural gas-fired power generation, commercial, residential, and industrial demand in the southeast United States.[30]  Transco further states that the project would replace obsolete and inefficient compressors on its system.  As stated above, Transco has entered into long-term precedent agreements with shippers for 100% of the project's capacity.

23.     Additionally, Transco provided a market study by Levitan and Associates, Inc. (Levitan Study) to demonstrate that the project is needed.[31]  The Levitan Study forecasts unprecedented electricity demand growth across the Southeast region, contrasting the historical 0.4% annual growth between 2013 and 2023 with a projected 2.8% annual

---

*Millennium Pipeline Co., LLC*, 145 FERC ¶ 61,007, at P 30 (2013).

[28] *See infra* PP 38-41.

[29] *See, e.g.*, *N. Nat. Gas Co.*, 174 FERC ¶ 61,189, at P 15 (2021) (finding that abandoning aging pipeline and replacing the capacity while maintaining the same level of service is not a subsidy); *S. Star Cent. Gas Pipeline, Inc.*, 169 FERC ¶ 61,214, at P 19 (2019) (finding that a replacement project designed to maintain existing services is not a subsidy).

[30] Transco December 18, 2025 Answer at 2.

[31] Transco June 24, 2025 Supplemental Filing (Levitan Study).

growth from 2023 to 2030.[32]  The Levitan Study states that new and expanding large loads, including data centers and manufacturing facilities, drive this transformation.[33]  The study also looks at existing gas infrastructure constraints and finds that the proposed project capacity is needed to support gas-fired generation.[34]  The Levitan Study emphasizes the need for supply diversity and fuel security during critical periods when gas-fired generation is essential for meeting seasonal peak demand over the next several years.[35]  The study concludes that without the proposed project existing pipeline capacity will be inadequate to support gas-fired generation additions.  Finally, the study states that the project would lower costs for ratepayers, estimate savings of $271 million to $718 million between 2028 and 2031, and would improve system efficiency.[36]

24.     Commenters in support of the SSE Project argue that the project's added capacity is needed to meet future demand in the region.[37]  Several project shippers argue that the project is needed because existing pipeline capacity on Transco's system is constrained

---

[32] *Id*. at 11.

[33] *Id.* at 13.  The study lists 271 proposed data centers in cities across the Southeast.  The study also assumes an increase in energy intensity for cloud computing and artificial intelligence usage.

[34] *Id.* at 25.  For example, the study details Duke Energy's 1,685,000 MMBtu/d requirement from three newly proposed and seven existing combined-cycle generation facilities.  These facilities would be supplied through existing firm transportation rights of 447,560 MMBtu/d on Transco's system sourcing from the Gulf Coast, the approved MVP Southgate Amendment Project (250,000 MMBtu/d), and the proposed SSE Project (1,000,000 MMBtu/d), for a total of 1,697,560 MMBtu of firm transportation rights.  *See id.* at 26 (citing Rebuttal Testimony of Verderame and Mitchell, North Carolina PUC Docket No. E-100, Sub 190, p. 11, line 3 through p. 13, line 2).

[35] The SSE Project is fully subscribed, with approximately 92% of its capacity subscribed by gas-fired generators and 7% by local distribution companies, to address grid reliability and winter peak demand.

[36] Levitan Study at 82.  In a sensitivity case with higher winter peak demand and increased gas-fired generation, 83% of these savings come from fuel cost reductions with the remainder coming from the enablement of more efficient combined-cycle generation to displace coal.  *Id.*

[37] *See, e.g.*, South Carolina Technology and Aviation Center December 3, 2024 Comment.

on days when demand is high.[38]  Duke Energy, the largest shipper for the project, states that the project addresses a significant market need and is a critical piece of its natural gas transportation strategy.[39]  It asserts that, until new low-carbon or zero-carbon fuels become economically available for utility-scale use in dispatchable generation, incremental natural gas capacity will be required to maintain least-cost and reliable operations.[40]  Duke Energy also argues that the project has been indirectly endorsed by the North Carolina Utilities Commission and Public Service Commission of South Carolina, the state utility commissions that regulate Duke Energy, by approving Duke Energy's respective integrated resource plans and acknowledging the need for incremental gas capacity to the Carolinas to assist with the reliable operation of the electric system.[41]

25.     Some commenters contend that there is no market need for the project, arguing that it would bind consumers to long-term fossil fuel infrastructure and fuel costs based on the unsubstantiated and inflated demand forecasts of a handful of monopoly utility companies.[42]  Environmental Groups filed a report, prepared by London Economics International (LEI), which they contend shows that the projected electricity demand from data centers presented by Transco in the Levitan Study may be flawed due to an inherent upward bias that overstates actual infrastructure needs.[43]  The LEI Report identifies a "phantom load" problem, which is that data center developers have incentives to submit multiple, redundant interconnection requests across several utility jurisdictions, creating a structural upward bias in forecasts.[44]  The report also concludes that the global supply chain of semiconductor chips is inadequate to support projected data center demand in

---

[38] *See, e.g.*, Patriots Energy Group December 3, 2024 Comment at 3.

[39] Duke Energy December 3, 2024 Comment at 4.

[40] *Id.*

[41] *Id.* at 4-5.

[42] *See, e.g.*, Sierra Club December 3, 2024 Comment at 3.

[43] Environmental Groups July 16, 2025 Comment, Supplemental Attachment (LEI Report).

[44] *Id.* at 13-14.  *See also id.* at 15 (citing Georgia Public Service Commission Docket No. 55378, *Microsoft's Comments on Georgia Power's 2023 Integrated Resource Plan Update* 1, 4 (Apr. 1, 2024), https://psc.ga.gov/search/facts-document/?documentId=218199).

the United States.[45]  The Institute for Energy Economics and Financial Analysis (IEEFA) filed a report that similarly concludes there is a risk of utilities in the Southeast overbuilding pipelines in response to projected data center energy demand, as forecasted data center demand may not materialize.[46]  The report finds that ratepayers will subsidize the infrastructure needed to serve data centers and that the subsidization will only worsen if infrastructure is overbuilt.[47]

26.     Notwithstanding the discrepancies between the studies, precedent agreements for an expansion project's entire capacity support a finding of project need.[48]  The Commission has found that precedent agreements are the best evidence that the service to be provided by the project is needed to connect supply and demand, as precedent agreements involve parties engaging in negotiations for pipeline transportation services to meet individualized needs.[49]  The Commission will not look beyond precedent agreements to assess need by other means unless there is credible, contrary evidence discounting their probative value.[50]  No such evidence exists here.

27.     While the LEI Report and IEEFA Report question the credibility of regional load growth forecasts, we find that they rely on speculative assumptions pertaining to data center demand estimates.  For example, the LEI Report relies on the notion that data center developers submit redundant requests for electric service across multiple utility jurisdictions.[51]  This claim is unsubstantiated by utility load forecast data, and supported only by anonymized quotes unattributed to any relevant entity or informational authority.  Additionally, the IEEFA Report claims that utilities are overstating their own load growth due to discrepancies with third-party load growth projections.  Conversely, the Levitan Study assessed pipeline capacity available to major shippers that have entered into non-

---

[45] *Id.* at 32-33.

[46] Institute for Energy Economics and Financial Analysis February 5, 2025 Comment, Supplemental Attachment at 5 (IEEFA Report).

[47] *Id.* at 24.

[48] *Gas Trans. Nw., L.L.C. v. FERC*, 157 F.4th 674, 705 (5th Cir. 2025) ("If a pipeline secures precedent agreements for an expansion project's entire capacity, FERC's decision to grant a § 7 certificate is supported by 'substantial evidence' under the APA.") (citations omitted).

[49] *Transcon. Gas Pipe Line Co., LLC*, 190 FERC ¶ 61,048, at PP 27, 29 (2025).

[50] *Gas Trans. Nw., L.L.C. v. FERC*, 157 F.4th 674 at 705 (citations omitted).

[51] LEI Report at 14-15.

speculative precedent agreements and concluded that the SSE Project is needed to meet future demand.  The Levitan Study also relies on utility provided forecasts and third-party projections, along with broader economic indicators, to conclude that additional pipeline capacity is needed through the early 2030s.  We find that, while forecasts are inherently subject to uncertainty, state utility regulators are well positioned to vet the input assumptions and criteria used in a forecast, as the state public utility commissions have done here.  The forecasts show that electricity demand clearly exists from those facilities, as reflected in recently state public utility commission-reviewed and approved utility integrated resource plans, such as the ones noted by Duke Energy above.[52]

28.     Regarding the IEEFA Report's conclusion that ratepayers will subsidize infrastructure needed to serve data centers, we note that state public utilities regulate the rate charged by shippers that are public utilities, and can thus ensure that ratepayers do not subsidize other end users.[53]  Moreover, the Commission views transportation service for all shippers as providing public benefits and does not weigh end uses differently for the purpose of determining need for a project.[54]

29.     Commenters also argue that the project interferes with a North Carolina state law that requires Duke Energy to reduce carbon emissions.[55]  As we have previously explained, natural gas transportation projects, such as this one, are not inherently incompatible with a state statute requiring a reduction in the average annual use of natural gas or in greenhouse gas (GHG) emissions.[56]  Moreover, we note that a state's emission reductions goals or laws relate to the end-use of gas over which the Commission does not exercise regulatory authority.  In any event, as noted above, Duke Energy states that the

---

[52] *See supra* P 24 (citing Duke Energy December 3, 2024 Comment at 4-5).

[53] *See, e.g.*, *id.* (explaining that the North Carolina Utilities Commission and Public Service Commission of South Carolina regulate the rates Duke Energy charges customers); *Transcon. Gas Pipe Line Co., LLC*, 192 FERC ¶ 61,134, at P 37 n.157 (2025) (citing *Nat. Gas Pipeline Co. of Am.*, 20 FERC ¶ 61,324, at 61,674 (1982) (citing *Panhandle E. Pipe Line Co. v. Mich. Pub. Serv. Comm'n*, 341 U.S. 329, 333 (1951) and *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507, 513-14 (1947))) (explaining that the consideration and review by the Commission of prices paid by end users to local distribution companies in sales are "expressly and affirmatively committed to State and local authority by the provisions of Sections 1(b) and Section 1(c) of the [NGA]").

[54] *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046, at P 18 (2020).

[55] *See, e.g.*, Diane Banks April 7, 2025 Comment at 1.

[56] *See Transcon. Gas Pipe Line Co.*, 190 FERC ¶ 61,048 at P 72.

North Carolina Utilities Commission supports its proposal to increase natural gas-powered generation in its resource planning and recognizes that natural gas-fired capacity is needed to ensure that system operators have the tools they need to manage system dynamics, ensure reliable operation, and protect the integrity of the bulk power system in North Carolina,[57] indicating that the project is not inconsistent with state utility goals.

30.    In any case, as noted above, Transco has entered into precedent agreements for 100% of the project's capacity, thus sufficiently providing evidence of need for the project.[58]

### 3.    Impacts on Existing Customers, Existing Pipelines and Their Customers, and Landowners and Surrounding Communities

31.    We find that the SSE Project will not adversely affect service to Transco's existing customers or other existing pipelines and their captive customers. Transco designed the project to both improve the reliability of existing services and to enable Transco to provide 1,596,900 Dth/d of incremental firm natural gas transportation service without degrading the service of Transco's existing customers. Further, there is no evidence that the project will displace service on any other systems. The project will enhance Transco's ability to serve incremental growth requirements, improve reliability and enhance operating flexibility. No pipelines or their captive customers have protested Transco's proposal.

32.    We are further satisfied that Transco has taken appropriate steps to minimize adverse economic impacts on landowners and surrounding communities. The project would disturb 1,451.83 acres of land during construction and 379.95 acres for operations.[59] Transco participated in the Commission's pre-filing process and actively worked with local stakeholders, including landowners, as well as federal and state agencies to develop the proposed project. Transco states that it has secured right-of-way

---

[57] Duke Energy December 3, 2025 Comment at 5.

[58] *See, e.g.*, *Transcon. Gas Pipe Line Co., LLC*, 190 FERC ¶ 61,048 at P 29 (affirming that precedent agreements are the best evidence of need); *Tex. Gas Transmission, LLC*, 181 FERC ¶ 61,049 (2022) (finding a long-term precedent agreement for almost 100% of the project's capacity is significant evidence of need for the proposed project). *See also Sierra Club v. FERC*, 38 F.4th 220, 230 (D.C. Cir. 2022) (finding a long-term precedent agreement for 80% of the project's capacity showed an actual need for the project); *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *1 (D.C. Cir. Feb. 19, 2019) (unpublished) (finding the Commission's conclusion that there is a market need for the project was reasonable and supported by substantial evidence, in the form of long-term precedent agreements for 100% of the project's capacity).

[59] EA at 4.

for approximately 94% of the acreage required for the project, and that it is still in active negotiations with the remaining landowners for those segments of right-of-way not yet obtained (97.17 acres).[60]  Transco has also made several adjustments to its planned construction workspaces to incorporate landowner requests.[61]

33.     We are satisfied that Transco has taken appropriate steps to minimize adverse economic impacts on landowners and communities affected by the project.

### 4.     Certificate Policy Statement Conclusion

34.     The project will provide 1,596,900 Dth/d of incremental firm transportation service as well as improve the reliability of Transco's system.  Transco has entered into binding agreements with the project shippers for 100% of the project's capacity.  Accordingly, we find that Transco has demonstrated a need for the project, and, further, that the project will not have adverse impacts on existing shippers or other pipelines and their existing customers, and that the project will have minimal economic impacts on landowners and surrounding communities.  Therefore, we conclude that the project is consistent with the criteria set forth in the Certificate Policy Statement and analyze the environmental impacts of the project below.[62]

### B.     Abandonment

35.     Section 7(b) of the NGA provides that an interstate pipeline company may abandon jurisdictional facilities or services only if the Commission finds the abandonment is permitted by the present or future public convenience or necessity.[63]  In deciding whether a proposed abandonment is warranted, the Commission considers all relevant factors, but the criteria vary with the circumstances of the particular proposal.[64]  Continuity and stability of existing services are the primary considerations in assessing whether the public convenience or necessity allow the abandonment.[65]  If the Commission finds that an

---

[60] *Id.*

[61] *E.g.*, Transco May 7, 2025, August 14, 2025, and October 14, 2025 Responses to Environmental Information Request.

[62] *See* Certificate Policy Statement, 88 FERC at 61,745-46 (explaining that only when the project benefits outweigh the adverse effects on the economic interests will the Commission then complete the environmental analysis).

[63] 15 U.S.C. § 717f(b).

[64] *El Paso Nat. Gas Co., L.L.C.*, 148 FERC ¶ 61,226, at P 11 (2014) (*El Paso*).

[65] *See, e.g.*, *Tex. E. Transmission, LP*, 176 FERC ¶ 61,206, at P 11 (2021) (citing

applicant's proposed abandonment of particular facilities will not jeopardize continuity of existing gas transportation services, the Commission generally will find that the public convenience or necessity permits the abandonment.[66]

36.     Here, as explained above, Transco proposes to abandon three existing electric motor-driven compressor units at Compressor Station 145 and replace them with three new electric motor-driven compressor units that are sufficient to maintain existing services and provide the new project capacity.  Because the proposed abandonment will not jeopardize continuity of existing natural gas transportation services and will improve the reliability of Transco's pipeline system, we find that the public convenience or necessity permits the abandonment.

## C.     Rates

37.     Transco states that the proposed facilities will cost $1,527,002,037 and proposes to allocate $75,812,961 of that as replacement costs, which would be borne by existing customers.[67]  As stated above, Transco proposes to replace three existing electric motor-driven compressor units at Compressor Station 145.  Transco states that its existing customers will benefit from the increased reliability of the new equipment and that combining the replacement of the existing horsepower with the project will reduce the non-incremental transmission plant costs significantly.  Transco therefore proposes to allocate the costs associated with Compressor Station 145 between project shippers and Transco's existing customers based on incremental horsepower (i.e., 61,500 HP) as a percentage of total horsepower installed (i.e., 99,000 HP), thus allocating 62.12%, or $124,326,852, of the costs associated with Compressor Station 145 to the expansion project and 37.88%, or $75,812,961, to replacement costs for existing customers.[68]

### 1.     Incremental Recourse Rate

38.     For the expansion capacity created by the project, Transco initially proposed an incremental daily reservation charge of $0.48929 per Dth, based on a first-year fixed cost of service of $285,194,246 and annual billing determinants of 582,868,500 Dth.  It proposed an incremental usage charge of $0.00423 per Dth using variable costs of

---

*El Paso*, 148 FERC ¶ 61,226 at P 12).

[66] *See, e.g., id.* (citing *Trunkline Gas Co.*, 145 FERC ¶ 61,108, at P 65 (2013)).

[67] Application at 17 & Ex. K.

[68] *Id.* at 16.

$2,464,183 and annual billing determinants of 582,868,500 Dth.[69]  Transco's cost of service was initially calculated using a pre-tax return of 13.54% and an onshore depreciation rate of 3.17% (including negative salvage), which were reflected in Transco's general NGA section 4 rate case filed on August 30, 2024 in Docket No. RP24-1035-000.[70]  On September 30, 2024,[71] as modified on October 8, 2024,[72] Transco's rate increases in that NGA section 4 proceeding were accepted and suspended, subject to refund and the outcome of hearing procedures.  On November 26, 2025, a settlement resolving all outstanding issues was certified as uncontested in Docket Nos. RP24-1035-000 and RP24-1035-004.[73]  The Settlement was approved by the Commission on December 30, 2025.[74]

39.    On December 2, 2025, Commission staff issued a data request asking that Transco recalculate the proposed incremental rate for project service utilizing the cost factors from the Settlement and provide a comparison to the relevant system rate that would apply to service on the project.  On December 10, 2025, Transco submitted its response (Data Request Response), demonstrating a revised incremental daily reservation charge of $0.44877 per Dth and usage charge of $0.00423 per Dth, which is equivalent to a combined 100% load factor rate of $0.45300 per Dth.

40.    The Commission's general policy for pipeline expansions is to use the cost factors approved in the pipeline's last general NGA section 4 general rate proceeding.[75]  We therefore find that it is appropriate for Transco to use the cost factors included in the

---

[69] *Id.* Ex. P at 1.

[70] *Id.* Ex. P at Preface.

[71] *Transcon. Gas Pipe Line Co., LLC*, 188 FERC ¶ 61,227 (2024).

[72] *Transcon. Gas Pipe Line Co., LLC*, 189 FERC ¶ 61,022 (2024).

[73] *Transcon. Gas Pipe Line Co., LLC*, 193 FERC ¶ 63,030 (2025) (Settlement).

[74] *Transcon. Gas Pipe Line Co., LLC*, 193 FERC ¶ 61,245 (2025).

[75] *See e.g.*, *Transcon. Gas Pipe Line Co., LLC*, 156 FERC ¶ 61,092, at P 26 (2016) ("[T]he Commission's consistent policy in section 7 certificate proceedings is to require that a pipeline's cost-based recourse rates for incrementally-priced expansion capacity be designed using the rate of return from its most recent general rate case approved by the Commission under section 4 of the NGA"); *Gas Transmission Nw., LLC*, 185 FERC ¶ 61,035, at P 40, n.85 (2023) ("The Commission's general policy with respect to pipeline expansions is to use the depreciation rate approved in the pipeline's last NGA section 4 general rate proceeding").

Settlement to calculate the incremental rate for service on the project. Accordingly, we will consider Transco's revised incremental rate for service on the project from its Data Request Response as the basis for rate comparison.[76]

41.     Under the Commission's Certificate Policy Statement, there is a presumption that incremental rates should be charged for proposed expansion capacity if the incremental rate exceeds the maximum system recourse rate.[77] We have reviewed Transco's proposed cost of service and revised rates submitted in the Data Request Response and find they are consistent with current Commission policy. As indicated in the Data Request Response, once the rates from the Settlement are effectuated, the corresponding system reservation charge will be $0.45974 per Dth and the usage charge $0.02683 per Dth, which is equivalent to a 100% load factor rate of $0.48657 per Dth.[78] The revised incremental rate for the project is therefore lower than the system rate resulting from the Settlement, and we direct Transco to use the system rate contained in the Settlement as the project recourse rate for the expansion capacity. In addition, consistent with Commission policy, Transco is directed to charge the applicable system interruptible rate for the expansion capacity.[79]

### 2.     Fuel Retention and Electric Power Rates

42.     Transco proposes to apply its generally applicable system fuel retention and electric power rates to the project. It included a fuel study in Exhibit Z-1 of its application, using 10 days of load profiles generated from actual system operating conditions during the annual period from July 1, 2023, to June 30, 2024, to assess the system impact of the project facilities over a wide range of system load factors.[80] The fuel study states that adding the project facilities results in a reduction in system fuel consumption attributable to existing customers for all 10 days sampled. Transco avers that the fuel benefit provided by the project to other Transco shippers supports its proposal to assess project shippers the generally applicable fuel retention and electric power rates under Rate Schedule FT.[81] Because the project facilities would yield a net

---

[76] Data Request Response, Ex. P at 3.

[77] Certificate Policy Statement, 88 FERC at 61,745.

[78] The system rates used here for comparison purposes are the Rate Schedule FT rates for Zone 4-5 and 5-4.

[79] *See, e.g., Tex. E. Transmission, LP*, 139 FERC ¶ 61,138, at P 31 (2012).

[80] Application, Ex. Z-1 at 1.

[81] Application at 24.

Docket No. CP25-10-000                                                                    - 19 -

system fuel benefit to the existing system customers, we approve Transco's proposal to apply its generally applicable system fuel retention and electric power rates to the project.

### 3.     Predetermination of Rolled-in Rate Treatment

43.     As stated previously, the proposed facilities will cost $1,527,002,037 and Transco proposes to allocate $75,812,961 of that cost to existing customers as replacement project costs.[82]  Transco states that its existing customers will benefit from the increased reliability of the new compression equipment and that combining the replacement of the existing horsepower with the increase in capacity reduced the non-incremental transmission plant costs significantly.  Despite Transco not having requested it, and consistent with longstanding Commission policy, we will also evaluate whether to grant a predetermination of rolled-in rate treatment for the expansion project costs.[83]

44.     The Certificate Policy Statement recognizes the appropriateness of rolled-in rate treatment for projects constructed to improve the reliability of service to existing customers or to improve service by replacing existing capacity, rather than to increase levels of service.[84]  Accordingly, we grant a predetermination that Transco may roll the replacement project costs into its system rates in a future NGA section 4 rate case, absent a significant change in circumstances.

45.     Regarding the expansion project costs, to receive a predetermination favoring rolled-in rate treatment, a pipeline must demonstrate that rolling in the costs associated with the construction and operation of new facilities will not result in existing customers subsidizing the expansion.  In general, this means that a pipeline must show that the revenues to be generated by an expansion project will exceed the project cost.  To make this determination, we compare the project cost to the revenues generated using actual contract volumes and either the maximum recourse rate or, if the negotiated rate is lower than the recourse rate, the actual negotiated rate.[85]

46.     Here, Transco's supporting workpapers demonstrate that incremental revenues of $283,606,326 exceed the incremental cost of the project of $261,572,091 by $22,034,235

---

[82] *Id.* at 17 & Ex. K.

[83] *See, e.g.*, *Millennium Pipeline Co., L.L.C.*, 145 FERC ¶ 61,007 at P 31 n.41 (stating that the Certificate Policy Statement contemplates that as a general matter, issues of future rate treatment should be addressed in advance).

[84] Certificate Policy Statement, 88 FERC at 61,746 n.12.

[85] *See Nat. Gas Pipeline Co. of Am., LLC*, 154 FERC ¶ 61,220, at P 25 (2016).

in the first year of service.[86]  Accordingly, a predetermination is granted for Transco to roll the expansion project costs of the SSE Project into its system rates in a future NGA section 4 rate case, absent a significant change in circumstances.

### 4.    Negotiated Rates

47.     Transco states that all project shippers elected to pay negotiated rates for service under the project, and accordingly, Transco proposes to provide service on the project to the project shippers under negotiated rate transportation agreements.  Transco must file either the negotiated rate agreements or tariff records setting forth the essential terms of the agreements in accordance with the Alternative Rate Policy Statement[87] and the Commission's negotiated rate policies.[88]

### 5.    Reporting Requirements

48.     We require Transco to keep separate books and accounting of costs and revenues attributable to the capacity created by the SSE Project in the same manner as required by section 154.309 of the Commission's regulations.[89]  The books should be maintained with applicable cross-reference and the information must be in sufficient detail so that the

---

[86] *See* Data Request Response.  Staff calculated the incremental revenues for the project based on the actual volumes of the negotiated agreements with project shippers (1,596,900 Dth/d) and Transco's Zone 4-5 Settlement recourse rate, as Transco's Zone 4-5 Settlement recourse rate is lower than the estimated, weighted negotiated rate.

[87] *Alts. to Traditional Cost-of-Serv. Ratemaking for Nat. Gas Pipelines; Regul. of Negotiated Transp. Servs. of Nat. Gas Pipelines*, 74 FERC ¶ 61,076, *clarification granted*, 74 FERC ¶ 61,194, *order on reh'g and clarification*, 75 FERC ¶ 61,024, *reh'g denied*, 75 FERC ¶ 61,066, *reh'g dismissed*, 75 FERC ¶ 61,291 (1996), *petition denied sub nom. Burlington Res. Oil & Gas Co. v. FERC*, 172 F.3d 918 (D.C. Cir. 1998) (Alternative Rate Policy Statement).

[88] *Nat. Gas Pipelines Negotiated Rate Policies & Pracs.; Modification of Negotiated Rate Pol'y*, 104 FERC ¶ 61,134 (2003), *order on reh'g and clarification*, 114 FERC ¶ 61,042, *reh'g dismissed and clarification denied*, 114 FERC ¶ 61,304 (2006).

[89] 18 C.F.R. § 154.309 (2025).  *See Gulf S. Pipeline Co., LLC*, 173 FERC ¶ 61,049, at P 6 (2020) (*Gulf South*) (for projects that use existing system rates for the initial rates the Commission's requirement for separate books and accounting applies only to internal books and records).

data can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case, and the information must be provided consistent with Order No. 710.[90]

### D.     Environmental Analysis

49.     On February 14, 2024, Commission staff began its environmental review of the SSE Project by granting Transco's request to use the pre-filing process, assigning Docket No. PF24-2-000.  As part of the pre-filing review, staff participated in open houses sponsored by Transco to explain the Commission's environmental review process to interested stakeholders.  The open houses were held March 6, 2024, in Chatham, Virginia; March 7, 2024, in Stoneville, North Carolina; March 11, 2024, in Winston-Salem, North Carolina; March 12, 2024, in Greensboro, North Carolina; March 13, 2024, in Lexington, North Carolina; March 14, 2024, in Grover, North Carolina; and March 19, 2024, in Statesville, North Carolina.

50.     As part of the pre-filing process, on May 7, 2024, the Commission issued a *Notice of Scoping Period Requesting Comments on Environmental Issues for the Planned Southeast Supply Enhancement Project and Notice of Public Scoping Session* (Notice of Scoping).  On June 6, 2024, the Commission issued a *Notice of Scoping Meetings and Extension of Scoping Period for the Planned Southeast Supply Enhancement Project.* Both notices were published in the *Federal Register*[91] and mailed to interested parties including federal, state, and local officials; agency representatives; environmental and public interest groups; Native American Tribes; local libraries and newspapers; and affected property owners.  Commission staff conducted a virtual public scoping session on May 21, 2024, and in-person public scoping sessions in Lexington, North Carolina and Chatham, Virginia on June 24 and 25, 2024, respectively, to provide the public with an opportunity to learn more about the project and comment on environmental issues that should be addressed in the environmental document.  Transcripts of the scoping sessions were entered into the public record in Docket No. PF24-2-000.[92]

---

[90] *See Revisions to Forms, Statements, & Reporting Requirements for Nat. Gas Pipelines,* Order No. 710, 122 FERC ¶ 61,262, at P 23 (2008).  In *Gulf South*, the Commission clarified that a pipeline charging its existing system rates for a project is not required to provide books and accounting consistent with Order No. 710.  However, a pipeline is required to maintain its internal books and accounting such that it would have the ability to include this information in a future FERC Form No. 2 if the rate treatment for the project is changed in a future rate proceeding.

[91] 89 Fed. Reg. 41427 (May 13, 2024) and 89 Fed. Reg. 49868 (June 12, 2024).

[92] We consolidate the complete record of the pre-filing proceeding in Docket No. PF24-2-00 with the record of this docket.

51.     In response to the Notice of Scoping and the Notice of Application, the Commission received numerous filings from elected officials, state and federal agencies, city governments, individuals, environmental and public interest groups/organizations, and companies.  The primary issues raised by the commenters were fossil fuel use and climate change; effects on communities; effects on water, wildlife, and cultural resources; property-specific effects of pipeline construction; property values; safety; alternatives; cumulative effects; need for increased natural gas supply in the region; and job creation.

52.     Pursuant to the National Environmental Policy Act of 1969 (NEPA),[93] Commission staff prepared an EA for Transco's proposal, which was issued on October 31, 2025.[94]  The Notice of Availability of the EA established a 30-day comment period.  It was mailed to interested parties including federal, state, and local officials; agency representatives; environmental and public interest groups; Native American Tribes; local libraries and newspapers; and affected property owners.  The EA was prepared with the cooperation of the U.S. Army Corps of Engineers (Corps) Norfolk District and U.S. Fish and Wildlife Service (FWS) Virginia Ecological Services Field Office.  The analysis in the EA addresses geology; soils; water resources; wetlands; fisheries; vegetation; wildlife; special status species; cultural resources; land use, recreation, and visual resources; public services, transportation and traffic, and property values; air quality; noise; reliability and safety; cumulative effects, including climate change; and alternatives.  The EA addressed all environmental comments received during scoping and concluded that approval of the project would not constitute a major federal action significantly affecting the quality of the human environment.[95]

---

[93] 42 U.S.C. §§ 4321 *et seq.*, *see also* 18 C.F.R. pt. 380 (2025) (Commission's regulations implementing NEPA).  The Council on Environmental Quality's (CEQ) final rule rescinding its NEPA regulations became effective on April 11, 2025.  90 Fed. Reg. 10610 (Feb. 25, 2025).

[94] For tracking purposes under NEPA, the unique identification number for documents relating to this environmental review is EAXX-019-20-000-1732530814.

[95] EA at 75.  Commission staff could not determine whether the effects from GHG emissions attributable to the project would be significant or insignificant.  *See* 42 U.S.C. § 4336(b)(2) ("An agency shall prepare an environmental assessment with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown . . . .").  We note that NEPA does not require that the Commission formally label project-related GHG emissions as significant or insignificant.  *See Citizens Action Coal. of Ind., Inc. v. FERC*, 125 F.4th 229, 241-242 (D.C. Cir. 2025) (holding that "the absence of a 'significance' label does not violate NEPA, CEQ guidance, or FERC regulations") (citing *Food & Water Watch v. FERC*, 104 F.4th 336, 346 (D.C. Cir. 2024) (*East 300*)); *see also*

Docket No. CP25-10-000                                                      - 23 -

53.    Under NEPA, the Commission considers impacts to all potentially affected communities.  Project activities that would affect local communities include the construction and operation of natural gas pipelines, the addition and replacement of compressor units at existing compressor stations, the installation of regulator facilities, and the modifications to valve controls and piping at several existing facilities.[96]  The project would affect a total of 1,451.8 acres of land during construction, and would permanently affect 380 acres of land during operation.[97]

54.    As described in the EA, the project's potential effects on local communities during construction include temporary to short-term visual effects due to large equipment, vehicles, dust, and clearing of vegetation;[98] temporary air quality effects including emissions from fossil-fueled construction equipment and fugitive dust;[99] temporary noise effects from construction equipment and horizontal directional drill (HDD) operations;[100] and temporary impacts on traffic from the movement and delivery of equipment, materials, and workers,[101] all of which would be less than significant.  To minimize air quality impacts during construction, Transco has committed to several minimization and mitigation measures such as restricting equipment idling and dust control measures.[102] To mitigate noise effects associated with the HDDs, Transco would implement acoustical barriers at the Dan River, Sandy River, and Banister River exit sites, Cascade Creek entry site, and Linville Lake entry and exit sites.[103]  Given the proximity of residences at the Linville Lake HDD and the time estimated to complete the drill, the EA recommends, and we require as Environmental Condition 14 in the appendix to this order, that Transco

---

*Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,200, at P 33 (2024) (applying *East 300* in the context of an EA).

[96] EA at 2.

[97] *Id.* at 4.

[98] *Id.* at 42.

[99] *Id.* at 45.

[100] *Id.* at 55.

[101] *Id.* at 43.

[102] *Id.* at 45.

[103] *Id.* at 51.

implement nighttime noise monitoring for the Linville Lake HDD.[104]  Transco would minimize impacts on traffic through implementation of its Traffic Management Plan, which directs the use of flaggers, steel plates to accommodate emergency vehicles, and detour plans for open-cut road crossings.[105]

55.     The EA finds that operation of the project would result in visual effects,[106] air effects,[107] and noise effects,[108] all of which would be less than significant.  It explains that permanent visual effects may occur in the viewshed of the project pipelines where forested areas are cleared and where periodic vegetation clearing is necessary; however, this would represent a minimal modification of the landscape as the pipelines would be buried, and about 93% of project pipelines would be collocated with Transco's existing pipeline system.  Modifications at the existing aboveground facilities would not change the existing visual character of these facilities.[109]  Regarding air impacts, the EA finds that operation of the project would not have significant impacts on air quality as emissions would be below the National Ambient Air Quality Standards (NAAQS) and notes that the operational emissions would be in compliance with all applicable federal and state air regulations.[110]  As to noise impacts, the project would include installation of a new regulator station and modifications that would affect operational noise at four compressor stations.  Transco would implement mitigation measures such as acoustically designed buildings and unit blowdown silencers, and noise modeling demonstrates that operational noise would be below the Commission's sound level criterion.[111]

---

[104] *Id.* at 51-52.

[105] *Id.* at 43.

[106] *Id.* at 42.

[107] *Id.* at 49.

[108] *Id.* at 53.

[109] *Id.* at 42.

[110] *Id.* at 45 & app. F.

[111] *Id.* at 52-53.

56.     The EA recommended implementation of Transco's proposed construction procedures and mitigation measures and Commission staff recommendations,[112] which we have adopted as conditions in the appendix of this order.

57.     The Commission received comments on the EA from members of the U.S. House Representatives, members of the Virginia General Assembly, members of the North Carolina General Assembly, the North Carolina State Historic Preservation Office, the Virginia Department of Environmental Quality, the Virginia Department of Conservation and Recreation-Division of Natural Heritage, many individuals, and several environmental and public interest groups/organizations.  We respond to these comments below.

### 1.     Procedural Concerns

#### a.     Preparation of an EIS

58.     Commenters state that an Environmental Impact Statement (EIS) should have been prepared for the project instead of or in addition to an EA, to assess the allegedly significant adverse effects, including those on local communities.[113]  Joint comments filed by the Southern Alliance for Clean Energy, Appalachian Voices, 7 Directions of Service, Sierra Club, Katie Whitehead, and Robert McNutt (Southern Alliance) further assert that in the EA staff improperly adopted Transco's framing of the impacts rather than exercising independent judgment regarding the significance of project impacts. Commenters further assert that if the Commission fails to complete an EIS for this project, it would be an arbitrary and capricious departure from past policy and practice for projects of this magnitude.[114]

59.     NEPA requires that a federal agency prepare an EIS if the proposed agency action has a reasonably foreseeable significant impact on the quality of the human environment.[115]  However, an agency may prepare an EA if the proposed action does not have a reasonably foreseeable significant effect on the quality of the human environment

---

[112] *Id.* at 75.

[113] *See, e.g.*, Southern Alliance December 1, 2025 Comments at 3-4.

[114] *See id.* at 4; Reps. Scott, Forshee, and McClellan December 1, 2025 Comments at 1-2.

[115] 42 U.S.C. § 4336(b)(1).

or if the significance of such effect is unknown.[116]  An agency's decision whether to prepare an EIS is left to its discretion.[117]

60.    Here, staff prepared an EA because neither the application nor comments during the scoping process identified the potential for significant effects, which was confirmed by the environmental review process.  The EA assessed the potential impacts of the project on a variety of resources and determined that project construction, abandonment, and operation would not constitute a major federal action significantly affecting the quality of the human environment.[118]  Accordingly, an EIS is not required.

### b.    Requests to Extend EA Comment Period and Insufficient Opportunity for Public Participation

61.    Commenters argue that the EA comment period should be extended to 90 days, and request that public meetings be held in every county along the pipeline route. Commenters assert that abbreviated and overlapping comment periods for this project and others, including MVP's Southgate Amendment Project, have placed a burden on the public's efforts to obtain information, review the dockets, and provide comments on the projects.[119]  Protect Our Water, Heritage, Rights (POWHR) further contends that the public encountered difficulty understanding the overlapping proposals and timelines for the SSE Project and the Southgate Amendment Project.[120]

---

[116] *Id.* § 4336(b)(2).

[117] *N.Y. v. Nuclear Regul. Comm'n*, 681 F.3d 471, 477 (D.C. Cir. 2012); *see also TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006) (explaining that an agency's evaluation of the consequences on the quality of the human environment is left to the judgment of the agency).  An agency's determination whether an impact is significant is entitled to deference.  *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989); *see also R.L. Vallee, Inc. v. Vermont Agency of Transportation*, No. 20-2665-CV, 2021 WL 4238120, at *2 (2d Cir. Sept. 17, 2021) (deferring to the agency's conclusion that project would not have a significant impact on travel patterns).

[118] EA at 75.

[119] *See, e.g.*, Joshua Vana's December 1, 2025 Comments and POWHR December 1, 2025 Comments at 1-2.  The Commission issued an order approving the Southgate Amendment Project on December 18, 2025.  *See Mountain Valley Pipeline, LLC*, 193 FERC ¶ 61,222 (2025).

[120] POWHR December 1, 2025 Comments at 2.

62.     Opportunities for public review and comment included seven open houses, two in-person and one virtual scoping meetings,[121] a 60-day scoping comment period, a 21-day application comment period, and a 30-day EA comment period.[122]  From May 2024 through January 2025, the Commission issued five separate notices for the project that were posted to the Commission's eLibrary docket and mailed to the environmental mailing list comprised of affected landowners and other interested stakeholders, including community and nongovernmental organizations, agency officials, and elected officials.  These notices included contact information for the Commission's Office of Public Participation (OPP) and information about how it can help members of the public access publicly available information and navigate Commission processes.[123]

63.     Regarding the length of the comment period, the 30-day comment period is adequate and consistent with the Commission's standard practice for an EA, and we therefore find no reason to extend it.[124]  The Commission issued notices for the projects, in their respective dockets, as they were ready, and each notice clearly specified the relevant project and comment period.[125]  Further, we have considered comments filed after the comment deadline, to the extent possible.  Accordingly, we do not find commenters have provided sufficient basis to extend the comment period on the EA.

---

[121] EA at 8.

[122] *Id.* at 9.

[123] Notice of Scoping May 24, 2024; Notice of Scoping Sessions/Extension of Scoping June 6, 2024, Notice of Application, November 12, 2024; Notice of Schedule, January 22, 2025; and Notice of Availability of the EA, October 31, 2025.

[124] *See* FERC, Staff Guidance Manual on Implementation of NEPA (June 2025), https://www.ferc.gov/media/staff-guidance-manual-implementation-national-environmental-policy-act-june-2025 ("Where staff solicits comments on an environmental assessment, the comment period will be 30 days").

[125] Moreover, commenters could, and indeed did, comment on the effects of the proposed SSE Project and the Southgate Amendment Project in this docket despite the EA comment period not being aligned.  *See, e.g.*, Haw River Assembly December 2, 2025 Comments at 2; Southern Alliance December 1, 2025 Comments.  And the Commission considered the cumulative effects of the project, which included impacts from the Southgate Amendment Project.  *See* EA at 56-70.  In any event, we note that "[t]he Commission, like other agencies, is generally master of its own calendar and procedures."  *Tallgrass Interstate Gas Transmission, LLC*, 154 FERC ¶ 61,277, at P 3 (2016) (citing *Stowers Oil & Gas Co.*, 27 FERC ¶ 61,001 (1984)).

c.      **Permits and Consultations**

64.      Commenters note that some permits, consultations, and approvals remain outstanding for the project and identify state permits and requirements that Transco may be required to comply with and obtain.[126]  Some commenters additionally request that the Commission delay its decision on the project application until after all consultation is complete.  Consistent with Commission practice, Environmental Condition 9 of this order requires that Transco file documentation that it has received all applicable authorizations required under federal law before commencing construction or abandonment activities.

65.      Information filed by Transco to fulfill pre-construction environmental conditions of this order will be available in the docket for public review.  We do not find it necessary or in the public interest to delay a decision on the project until the outstanding material has been submitted.[127]  Commission staff will carefully review all information submitted to ensure that Transco has complied with all applicable conditions before a notice to proceed with the activity to which the conditions are relevant can be issued.  Moreover, Transco is responsible for obtaining and maintaining all state and local permits and approvals required by federal law to construct and operate the project.  Further, the Commission encourages cooperation between interstate pipelines and local authorities, noting that state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  Accordingly, we conclude that we have sufficient information to issue this order and that any additional information will be dealt with appropriately.

---

[126] *See, e.g.*, Appalachian Voices December 1, 2025 Comments at 2 and Caleb Merendino November 28, 2025 Comments.

[127] The Commission's practice of issuing conditional certificates has consistently been affirmed by courts as lawful.  *See Del. Riverkeeper Network v. FERC*, 857 F.3d 388, 399 (D.C. Cir.  2017) (upholding Commission's approval of a natural gas project conditioned on securing state certification under section 401 of the Clean Water Act); *see also Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1320-21 (D.C. Cir. 2015); *Pub. Utils. Comm'n. of Cal. v. FERC*, 900 F.2d 269, 282 (D.C. Cir. 1990) (holding the Commission had not violated NEPA by issuing a certificate conditioned upon the completion of the environmental analysis).  The Commission's approach is a practical response to the reality that it may be impossible for an applicant to obtain all approvals necessary to construct and operate a project in advance of the Commission's issuance of its certificate without unduly delaying a project.  *See, e.g., Broadwater Energy LLC*, 124 FERC ¶ 61,225, at P 59 (2008); *Crown Landing LLC*, 117 FERC ¶ 61,209, at P 26 (2006); *Millennium Pipeline Co., L.P.,* 100 FERC ¶ 61,277 at PP 225-231.

66.     The EA contained a recommendation (no. 12) that would have required Transco to file, within 5 days of receipt of the water quality certifications issued by Virginia Department of Environmental Quality and North Carolina Department of Environmental Quality, the complete certifications, including all conditions.[128]  Because Transco has obtained and filed the water quality certifications for the project,[129] the recommendation in the EA is not included as a condition in this order.  Instead, we are adding Environmental Condition 12 to the appendix of this order, incorporating the conditions of the water quality certifications and requiring Transco to file prior to any construction any revisions to its project design necessary to comply with the water quality certifications.

### 2.     Comments on the EA

### a.  Water Resources

67.     Commenters state that Transco should not be permitted to cross wetlands and waterbodies using dry-ditch, open-cut methods given that trenchless construction methods would be less harmful to the environment.[130]  Southern Alliance states that the EA fails to consider several trenchless waterbody crossing techniques,[131] and that the use of dry-ditch, open-cut crossings would have a "far greater impact" on the aquatic ecosystem than trenchless crossings such as HDD or conventional bore.[132]  The project would cross 12 waterbodies via trenchless construction, including the Dan River, Sandy River, and Banister River.[133]  Crossing waterbodies using dry-ditch methods would avoid direct in-water work and minimize effects on water quality.[134]  Dry-ditch crossing methods are more environmentally protective than wet open-cut crossing methods.  In considering whether to require a trenchless crossing, which is more complex and costly and requires additional time and workspace than a trenched crossing, staff considers the significance of the impact that would be avoided.  Here, on balance, Commission staff

---

[128] EA at 78.

[129] Transco December 23, 2025 Filing.

[130] *See, e.g.*, Southern Alliance December 1, 2025 Comments at 25; Caleb Merendino November 28, 2025 Comments; and Appalachian Voices December 1, 2025 Comments at 2.

[131] Southern Alliance December 1, 2025 Comments at 18-21.

[132] Southern Alliance December 1, 2025 Comments at 16.

[133] EA at 19.

[134] *Id.* at 20.

did not identify any additional streams for which a trenchless crossing technique was warranted.

68.     Southern Alliance further states that Transco's analysis of the impacts from dry-ditch, open-cut crossings and the feasibility of trenchless crossings lacks field-verified geotechnical information for all of its waterbody crossings.[135]  Consequently, it argues that without information collected from the field at each crossing site, the Commission lacks sufficient evidence and analysis for determining whether to prepare an EIS.  We disagree.

69.     Transco evaluated each waterbody crossing individually with the best available data and presented the information and proposed crossing methods in its application to the Commission.  Commission staff reviewed the proposed crossing methods and available data, as did multiple other agencies.  Staff concluded that, based on the available information and decades of experience with the review and monitoring of waterbody crossings by natural gas pipelines, Transco's proposed crossing procedures are appropriate.[136]  As the courts have concluded, "[w]hile additional data might enable a more detailed environmental analysis, NEPA does not require maximum detail" but instead, "requires agencies to make a series of line-drawing decisions based on the significance and usefulness of additional information."[137]  If conditions discovered in the field at a specific waterbody crossing during construction reveal that an alternate crossing method is necessary to minimize impacts, Transco is required to submit a variance request to the Commission for review and approval, including an assessment of the associated environmental impacts.

70.     Southern Alliance references eight waterbodies along the Eden Loop that Transco proposes to cross using dry-ditch methods, and notes that MVP proposes to cross these same waterbodies using trenchless crossing methods such as conventional bore for the Southgate Amendment Project.[138]  Southern Alliance also notes that Transco proposes to bore under existing roads and railways but errs in not extending these crossing methods to adjacent streams.[139]  Commission staff evaluated Transco's proposed waterbody

---

[135] Southern Alliance December 1, 2025 Comments at 26.

[136] EA at 5.

[137] *Duncan's Point Lot Owners Ass'n, Inc. v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008) (quoting *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987)) (citations omitted).

[138] Southern Alliance December 1, 2025 Comments at 21.

[139] *Id.* at 25.

Document Accession #: 20260129-3076      Filed Date: 01/29/2026

crossing procedures and determined that they would be sufficiently protective of the affected waterbodies and in accordance with the Commission's Wetland and Waterbody Construction and Mitigation Procedures (Procedures).[140]  The Commission's Procedures provide baseline construction and mitigation measures developed to minimize the impacts of construction on wetlands and waterbodies.  In addition, Transco has developed project-specific construction, mitigation, and restoration plans to further minimize impacts.[141]  As noted above, in considering whether to require a trenchless crossing, which is more complex and costly, staff considers the significance of the impact that would be avoided.  Here, on balance, Commission staff did not identify any additional waterbodies for which a trenchless crossing technique was warranted.  The EA appropriately concludes that, with the proposed mitigation measures, the SSE Project would not significantly affect surface water resources.[142]

71.      Southern Alliance identifies a variance requested by Transco in its application for a Virginia state permit (Virginia Water Protection Program, permit 25-1277) to exceed 500 linear feet of trench open at one time in upland areas, and expresses concern about sedimentation to water resources.[143]  Transco will be required and has committed to comply with our Upland Erosion Control, Revegetation and Maintenance Plan, which, among other things, requires that a project proponent plan construction sequencing to limit the amount and duration of open trench sections, as necessary, to prevent excessive erosion or sediment flow into sensitive environmental resource areas.  Accordingly, we concur with the conclusion in the EA that impacts on surface water from sediment flow into water resources would be less than significant.[144]

72.      Commenters express concern that construction of the project would be disruptive to waterbodies and affect sources of drinking water for local communities.[145]  Southern Alliance also makes note of state water quality designations for waterbodies crossed in

---

[140] EA at 21.

[141] *Id.* at 5-6.

[142] *Id.* at 20.

[143] Southern Alliance December 1, 2025 Comments at 29.

[144] EA at 20.

[145] *See, e.g.*, Caleb Merendino November 28, 2025 Comments; Southern Alliance December 1, 2025 Comments at 27-35; and Appalachian Voices December 1, 2025 Comments at 2.

Document Accession #: 20260129-3076          Filed Date: 01/29/2026

North Carolina.[146]  As stated in the EA, no potable water intake sources would be within 3 miles downstream of a project waterbody crossing.[147]  As described in the EA, Transco would design and install best management practices that control soil erosion and sedimentation down-gradient of construction areas and restore construction areas and re-establish vegetation in order to prevent erosion and sedimentation into and along waterbodies.[148]  Transco would also implement its Spill Plan to prevent and, if necessary, control inadvertent spills or leaks of hazardous materials or petroleum products, which could affect water quality.  These steps would minimize impacts on surface waters, including on waterbodies in North Carolina.  Accordingly, the EA concluded that impacts on surface water from the project would not be significant,[149] and we agree.

73.      Annie Doran expresses concern regarding pipeline spills affecting water resources.[150]  The project would transport natural gas rather than fluids and thus does not pose the same risk of spills from leaks that a pipeline carrying petroleum products would have.

74.      Regarding pre- and post-construction testing of water wells described in the EA,[151] Southern Alliance questions how frequent that testing would be required and who would pay for it.[152]  Southern Alliance additionally asserts that the EA failed to evaluate the anticipated frequency and extent of physical damage to water supply wells as a result of construction.[153]  We clarify that project construction is not anticipated to damage water supply wells[154] and that, if testing is done, it would occur once before construction and once after construction, and Transco would be responsible for providing a qualified, independent testing service.

---

[146] Southern Alliance December 1, 2025 Comments at 31.

[147] EA at 18.

[148] *Id.* at 20.

[149] *Id.*

[150] *See, e.g.*, Annie Doran December 1, 2025 Comments.

[151] EA at 17.

[152] Southern Alliance December 1, 2025 Comments at 31.

[153] *Id.* at 32-33.

[154] EA at 12.

75.     Southern Alliance states the project would violate North Carolina state rules, which require 50-foot riparian buffers adjacent to surface waters in the Jordan and Randleman Lake watersheds.[155]  The commenters note that Transco must receive a Riparian Buffer Authorization, which Transco has not yet obtained, and that the EA fails to address project compliance with these rules.[156]  Table B1 of the EA[157] notes that Transco applied for a buffer authorization or variance for Jordan and Randleman Lakes from the North Carolina Department of Environmental Quality on June 2, 2025, and receipt is pending.  The EA further includes a recommendation that Environmental Inspectors shall be responsible for documenting compliance with environmental conditions/permit requirements imposed by other federal, state, or local agencies,[158] and that recommendation is included as Environmental Condition 7 in the appendix to this order.

76.     Southern Alliance states that Transco's proposed measures to minimize impacts on wetlands and streams are vague, flawed, and outdated.[159]  The commenters further state that the scientific literature on stream crossings indicates that genuine restoration will likely not have occurred by the time Transco finishes its post-construction monitoring.[160]  The Commission's Procedures include performance-based best management practices and standards that are derived from staff's experience monitoring natural gas pipeline construction in the field.  The Commission's Procedures include measures that require Transco to reestablish and monitor wetlands to ensure they are successfully revegetated with herbaceous and/or woody plant species and, within three years after construction, to file a report with the Secretary of the Commission identifying the status and documenting success of its wetland revegetation efforts.[161]  Additionally, and as stated in the EA, Transco has applied for individual permits under Clean Water Act (CWA) section 404 from the Corps, which may include additional mitigation measures.[162]  Therefore,

---

[155] Southern Alliance December 1, 2025 Comments at 33.

[156] *Id.*

[157] EA, app. B at 1.

[158] *Id.* at 77.

[159] Southern Alliance December 1, 2025 Comments at 37.

[160] *Id.* at 39.

[161] Commission's Procedures at VI.D.5. and VI.D.6.

[162] EA at 20.

Commission staff appropriately determined that Transco's proposed wetland crossing procedures and restoration methods are appropriate.

77.     Southern Alliance also points out that the Commission recently directed a pipeline company to apply a risk-based approach to minimize impacts, recognizing its value in helping to protect aquatic resources[163] and requests that the Commission explain why a similar analysis is not required for Transco's project.[164]

78.     The project Southern Alliance refers to is the Ridgeline Expansion Project (CP23-516-000), where East Tennessee Natural Gas, LLC (East Tennessee) elected to determine how best to mitigate and monitor waterbody crossings that could present the highest risk(s) to aquatic habitat and species by evaluating the characteristics of each stream crossing and determining which are low, moderate, or high risk based on the U.S. Department of the Interior's (Interior) document *Risk-Based Approach to Designing And Reviewing Pipeline Stream Crossings to Minimize Impacts to Aquatic Habitats and Species*.[165]  Here, Transco did not elect to undertake a similar risk-based analysis, and Southern Alliance fails to identify the specific aquatic resources and/or habitats that would warrant requiring a risk-based approach.  The approach used for Transco's project is consistent with that used for the majority of applications reviewed by Commission staff.  Staff determined that the overall site-specific conditions associated with the project area and proposed crossing procedures did not require the use of a specialized methodology.  We agree.

### b.  Fisheries, Vegetation, and Wildlife

79.     Commenters express general concerns regarding the effects of waterbody crossings on plants and wildlife (including aquatic resources).[166]  The Southern Alliance states that dry-ditch waterbody crossings would have foreseeable long-term effects on the aquatic ecosystem, including freshwater mussel species, and expresses concern that the

---

[163] Southern Alliance December 1, 2025 Comments at 44.

[164] *Id.* at 45.

[165] East Tennessee's April 29, 2024 Data Response.  Commission staff asked East Tennessee to provide a review of stream crossings and potential impacts on aquatic habitat using Interior's document to assist staff in responding to a comment from EPA. *See* Commission Staff April 23, 2024 Environmental Information Request to East Tennessee.

[166] *See, e.g.*, Appalachian Voices December 1, 2025 Comments; Virgina General Assembly November 18, 2025 Comments at 2; Southern Alliance December 1, 2025 Comments at 27.

Docket No. CP25-10-000                                                                                      - 35 -

Virginia state permit includes waivers of some of the time of year crossing restrictions.[167] Commenters also express concerns regarding habitat fragmentation and degradation.[168]

80.      The waiver of warmwater timing restrictions for most unnamed perennial, intermittent, and ephemeral waterbodies that would be crossed by the project in Virginia was described in the EA and factored into staff's significance determinations.[169]  The EA addresses effects of the project on fisheries, vegetation, wildlife, and habitat, as well as Transco's measures to minimize impacts.[170]  Those minimization measures include crossing 12 waterbodies via trenchless construction, including the Dan River, Sandy River, and Banister River, and implementation of erosion and sediment control measures during construction and restoration.[171]  The EA concludes that effects on fisheries, vegetation, and wildlife from construction and operation of the project would not be significant.[172]  We agree.

81.      The Virginia Department of Conservation and Recreation's Division of Natural Heritage provided information and recommendations regarding natural heritage resources in the area of the Virginia portion of the project.  These resources include the tricolored bat, littleleaf sensitive-briar, and Roanoke logperch.[173]  The EA provides information on these species and Transco's measures to minimize or avoid effects on them, which are consistent with Virginia Department of Conservation and Recreation's Division of Natural Heritage recommendations.[174]

82.      Southern Alliance states that the North Carolina Wildlife Resources Commission requested that Transco conduct mussel occupancy surveys at four waterbodies along the

---

[167] Southern Alliance December 1, 2025 Comments at 27-31.

[168] *See, e.g.*, Brittany Jacobsen November 19, 2025 Comments; Emily Shepard December 1, 2025 Comments; and Briana Strickland December 2, 2025 Comments.

[169] EA at 22.

[170] *Id.* at 21-25.

[171] *Id.* at 19.

[172] *Id.* at 22, 24-25.

[173] The tricolored bat is proposed for listing as endangered under the Endangered Species Act, and the littleleaf sensitive-briar and Roanoke logperch are states species of concern.

[174] *Id.* at 33 & app. B.

Salem Loop that would be crossed by dry-ditch, open-cut methods.[175]  They note that the EA makes no mention of those surveys or their status.[176]

83.     Transco completed the surveys requested by North Carolina Wildlife Resources Commission and filed the results in the project docket on October 14, 2025.  These surveys were conducted as follow-up to previous surveys of 17 waterbodies in 2024 that had indicated no suitable habitat for mussels was present, filed in the project docket as privileged on January 31, 2025.  The new surveys confirmed that the areas surveyed do not support mussel populations.

84.     Southern Alliance states that the EA made premature conclusions regarding impacts on wildlife, specifically federally listed species, without sufficient information, and alleges that the Commission cannot make a significance determination regarding sensitive species until Endangered Species Act (ESA) consultation is complete.[177]

85.     Descriptions of habitats, survey results, and potential effects on federally threatened and endangered species potentially occurring in the project area, as well as Commission staff's impacts determinations and rationales for each species are detailed in table B.4-2 of the EA.[178]  The ESA consultation process is distinct from the NEPA process.  Here, as documented in the EA, Commission staff appropriately analyzed and considered potential effects on federally listed species as required by NEPA, and on January 22, 2026, FWS concurred with staff's determination that the project may affect, but is not likely to adversely affect listed species or their critical habitat.[179]  Therefore, ESA consultation is complete and the EA's recommended environmental condition 13, which required that construction activities not begin until consultation with FWS is complete, is not included in the appendix to this order.

### c.  Land Use

86.     Ann Dorsey comments that easements may disqualify landowners from certain forestry or agricultural tax credits due to permanent land use changes.[180]  About 93% of

---

[175] Southern Alliance December 1, 2025 Comments at 46.

[176] *Id.*

[177] Southern Alliance December 1, 2025 Comments at 45.

[178] EA at 28.

[179] FWS January 22, 2026 Section 7 Consultation Letter at 11.

[180] Ann Dorsey December 1, 2025 Comments.

project pipelines would be collocated with Transco's existing pipeline system, and about 73% of land required for pipeline construction would be within Transco's existing easement.[181]  The effect that a pipeline easement may have on disqualifications from tax credits is a damage-related issue that may be negotiated between the landowner and Transco during the easement acquisition process.

### d.  Air Quality

87.     Commenters state that the project would create a steep increase in harmful air pollution emissions, particularly at Compressor Stations 150 and 155 in North Carolina.[182]  Southern Alliance asserts that if the compressor station expansions are approved, future compliance with NAAQS is not assured.[183]  Commenters also state that rather than adopt the emissions estimates provided by Transco the Commission must independently assess operational emissions, particularly those associated with blowdowns and fugitives.[184]

88.     The EA describes expected air emissions from the project during construction and operation, including operation of Compressor Stations 150 and 155.[185]  The EA also includes and considers an air dispersion modeling analysis for Compressor Stations 150 and 155 using standard industry methodology (EPA's AERMOD dispersion model), which shows that the project's emissions, including regional concentrations from background and the existing compressor station emissions, would be below the NAAQS for all criteria air pollutants.[186]  Transco provided its construction and operation emissions calculations and air quality modeling files as appendices to Resource Report 9. Commission staff performed a thorough review of this information, as well as information provided by Transco in response to environmental information requests and other supplemental filings.  After the project is in-service, both Compressor Stations 150 and 155 would become "major sources" under the Title V program, as the total emissions for some of the criteria pollutants would exceed the 100 tons per year threshold, and a

---

[181] EA at 4.

[182] *See, e.g.*, Richard Vultaggio November 24, 2025 Comments; Sierra Club December 1, 2025 Comments; Southern Alliance December 1, 2025 Comments at 12.

[183] Southern Alliance December 1, 2025 Comments at 54.

[184] *Id.* at 68.

[185] *Id.* at 45-49.

[186] *Id.* at app. B, tbls. B28 & B29.

Docket No. CP25-10-000                                                    - 38 -

Title V permit would be required for both stations.[187]  Compressor Stations 150 and 155 would remain a minor source of hazardous air pollutants, as they would emit less than 10 tons per year of a single hazardous air pollutant.  We note that, with respect to Compressor Stations 150 and 155, the North Carolina Department of Environmental Quality is the agency tasked with implementing the relevant portions of the Clean Air Act, including establishing and enforcing permitting standards, conditions, and compliance under the Clean Air Act Title V Operating Permit program.  The North Carolina Department of Environmental Quality operates a statewide air quality monitoring network to measure the level of pollutants in the outdoor air and develops and maintains its State Implementation Plan, as approved by EPA, to maintain and enforce the NAAQS in North Carolina.  And Southern Alliance's assertion that future compliance with the NAAQS is not assured is mere speculation which we will not entertain.[188]  The EA concludes that operation of the project would not have significant effects on air quality.[189]  We agree.

89.    Southern Alliance states that the EA fails to quantify or consider the significant air quality and health impacts of burning natural gas for power generation even though the Commission relies on those combustion uses as central "benefits" in its NGA public interest analysis.[190]  Multiple commenters also request an assessment of the health effects of the project, particularly due to air emissions from Compressor Stations 150 and 155.[191]

90.    As noted above, the total emissions from the modified compressor stations combined with the ambient background would be below the NAAQS for all the criteria pollutants.[192]  Southern Alliance urges the Commission to complete an additional health

---

[187] *Id.* at app. F at 3.  Transco filed an application for a Title V permit with the North Carolina Department of Environmental Quality on April 16, 2025.

[188] *Mich. Pub. Power Agency v. FERC*, 963 F.2d 1574, 1580 (D.C. Cir. 1992) ("We see no grounds to require [the Commission] to allocate its limited resources to full-fledged investigation of the . . . claims, which were primarily hypotheticals with no evident basis in fact or experience.").

[189] Southern Alliance December 1, 2025 Comments at 49.

[190] Southern Alliance December 1, 2025 Comments at 57.

[191] *See, e.g.*, Linda V. Linfors November 14, 2025 Comments; Annie Doran December 1, 2025 Comments; Southern Alliance December 1, 2025 Comments at 54; North Carolina General Assembly December 1, 2025 Comments at 2.

[192] EA at 48-49.

assessment from these emissions,[193] but as the courts have affirmed, the Commission may rely on compliance with the NAAQS as an appropriate measure of impacts on public health.[194]  With respect to air quality impacts of burning natural gas for power generation, we are not required to consider in our NEPA analysis indirect, downstream emissions from the end use of transported gas as those are effects over which the Commission does not exercise regulatory authority.[195]

91.    Southern Alliance states that Transco's modeling indicates that Compressor Station 150 's emissions would result in fenceline concentrations above the Significant Impact Levels (SIL) for nitrogen dioxide ($NO_2$) (1-hour and annual) and $PM_{2.5}$ (24-hour and annual), while Compressor Station 155's emissions would result in fenceline concentrations above the SIL for $NO_2$ (1-hour).  They assert that if there are any modeled exceedances of the NAAQS, the project's contribution to such exceedance(s) would be presumed significant.[196]

92.    In its comments, Southern Alliance refers to the air dispersion modeling analysis for Compressor Station 150 included in the project application filing,[197] which included a modeling analysis showing an exceedance of the SIL for $NO_2$ (1-hour).  However, Transco filed an updated modeling analysis to identify impacts from the new sources versus existing sources at Compressor Stations 150 and 155.[198]  The updated modeling analysis showed that the impacts for the proposed new emissions sources at Compressor Station 150 would not result in an exceedance of the SIL for any of the criteria pollutants

---

[193] Southern Alliance December 1, 2025 Comments at 54.

[194] *See Transcon. Gas Pipe Line Co., LLC*, 187 FERC ¶ 61,024, at P 60 (2024) (citing *Sierra Club v. FERC*, 867 F.3d 1357, 1370, n.7 (D.C. Cir. 2017)).  The EPA developed the NAAQS to protect human health, including that of sensitive populations (e.g., people with asthma or cardiovascular disease, children, the elderly, and others) to account for the latest research on health impacts.  *See id.* P 59.

[195] *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 188-910 (2025) (*Seven Cnty.*) (explaining that "NEPA calls for the agency to focus on the environmental effects of the project itself;" and that agencies "are not required to analyze the effects of projects over which they do not exercise regulatory authority.").

[196] Southern Alliance December 1, 2025 Comments at 52-54.

[197] Transco October 29, 2024 Application Filing, Resource Report 9, Table 9.2-16 at 9-42.

[198] Transco August 14, 2025 Environmental Information Response, Tables 9.2-16 and 9.2-17 at 25, 204 & 25, 206.

while the impacts for the proposed new emissions at Compressor Station 155 remain above the SIL for $NO_2$ (1-hour). The EA includes the updated air dispersion modeling analysis for Compressor Stations 150 and 155 and an evaluation of the SIL analysis for each compressor station.[199]

93.     As we recently explained, the Commission uses EPA-established SILs and NAAQS to fulfill its obligations under NEPA to disclose air quality impacts of natural gas infrastructure projects within its jurisdiction.[200] The EPA developed SILs as a tool that permitting authorities, typically state agencies, may use to demonstrate whether emissions from a proposed source or modification will cause or contribute to air pollution in excess of the NAAQS for purposes of demonstrating compliance with permitting requirements under the Clean Air Act's Prevention of Significant Deterioration (PSD) program.[201]

---

[199] EA at app. B, tbls. B28 & B29; Transco February 26, 2025 Environmental Information Response at 55.

[200] *See, e.g.*, *ANR Pipeline Co.*, 194 FERC ¶ 61,059, at P 69 (2026); *Commonwealth LNG, LLC*, 191 FERC ¶ 61,205, at PP 4-6 (2025).

[201] 42 U.S.C. § 7475(a)(3) (generally prohibiting construction of a major emitting facility unless the facility operator demonstrates that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any: (a) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which Part C of 42 U.S. Code Chapter 85 Subchapter I (Prevention of Significant Deterioration of Air Quality) applies more than one time per year, (b) NAAQS in any air quality control region, or (c) any other applicable emission standard or standard of performance under the chapter). *See, e.g.*, EPA, *Guidance on Significant Impact Levels for Ozone & Fine Particles in the Prevention of Significant Deterioration Permitting Program* 11 (April 17, 2018) (EPA Ozone and PM SILs Guidance), https://www.epa.gov/sites/default/files/2018-04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf (noting that the SILs for ozone and PM are numerical values below which the EPA considers a source to have an insignificant effect on ambient air quality because the degree in changes in pollutant concentrations caused by an individual contribution below the SIL are "indistinguishable from the inherent variability in the measured atmosphere and may be observed even in the absence of the increased emissions" and "changes in air quality within this range are not meaningful, and, thus, do not contribute to a violation of the NAAQS"); *see also* EPA, *Guidance Concerning the Implementation of the 1-hour $NO_2$ NAAQS For the Prevention of Significant Deterioration Program* 4, 11 (June 29, 2010) (EPA Interim 1-hour $NO_2$ SIL Guidance), https://www.epa.gov/sites/default/files/2015-07/documents/appwno2.pdf (noting that it

94.    SILs are an integral part of EPA's three-step modeling analysis that uses modeled project emissions in comparison to the SILs to determine if a facility would not cause or contribute to any exceedance of the NAAQS.[202]  The up to three-step analysis includes: (1) a preliminary screening step; (2) if necessary, a full cumulative impacts analysis; and (3) if necessary, a cause and contribute (i.e. culpability) analysis.  Generally, during Step One, the preliminary screening step, the applicant models a source's potential emissions and compares the proposed facility's highest projected ambient air quality impact to the SIL for each criteria pollutant and averaging period (e.g., 1-hour, 8-hour, 24-hour, or annual) to determine if the project's emissions exceed the SIL.[203]  Under Step One, if the predicted impacts for a particular criteria pollutant are below the applicable SIL, then no further analyses or modeling are required for that pollutant/averaging period.[204]  If model-predicted concentrations are greater than the applicable SIL, a cumulative impact analysis is performed for that pollutant and averaging period (i.e., Step Two).[205]  The cumulative analysis considers emissions from existing sources in addition to the project's modeled emissions at multiple receptors within the potential radius of impact.[206]  If there are no predicted NAAQS exceedances identified in the cumulative impact analysis, there is no need to proceed to Step Three, the cause and contribute analysis.  For Step Three, under

---

"considers a source whose individual impact falls below a SIL to have a de minimis impact on air quality concentrations that already exist" and that further analysis would "yield trivial gain" with regard to reducing ambient pollutant concentrations).

[202] The three-part analysis is outlined in EPA's air quality modeling procedures at 40 C.F.R. pt. 51, app. W (2025) as an available tool for state permitting agencies may use.  EPA, *Support Center for Regulatory Atmospheric Modeling (SCRAM) -Air Quality Dispersion Modeling-Preferred and Recommended Models*, https://www.epa.gov/scram/air-quality-dispersion-modeling-preferred-and-recommended-models.

[203] *Commonwealth LNG, LLC*, 191 FERC ¶ 61,205 at P 5.

[204] *See id*.; *see also Venture Glob. CP2 LNG, LLC*, 191 FERC ¶ 61,153, at P 5 (2025) (noting that proceeding to Step Two or Three is not necessary where SILs were not exceeded in Step One); EPA Ozone and PM SILs Guidance at 11 (stating that "a permitting authority can reasonably conclude that emissions of a proposed source that have a projected impact below the SIL values provided in this memorandum are not the reason for, responsible for, or the 'but for' cause of a NAAQS violation"); EPA, *Legal Memo:  Application of Significant Impact Levels in the Air Quality Determination for PSD Permitting under the CAA* 13 (Apr. 17, 2018.

[205] *Commonwealth LNG, LLC*, 191 FERC ¶ 61,205 at P 5.

[206] *Id.*

the Clean Air Act, the federally delegated state agency evaluates whether the proposed facility's level of emissions of the criteria pollutant at issue is at a level that the EPA considers to have contributed to the potential NAAQS exceedance. States use the applicable SIL as a threshold for this determination. Accordingly, in cases where the cumulative modeling of existing sources identifies a potential NAAQS exceedance of a criteria pollutant, for most pollutants, if the modeled contribution from the project is less than the SIL at the receptor and time period of the predicted NAAQS exceedance, the proposed facility is deemed to not have caused or contributed to the exceedance and the state may issue the permit.[207]

95.     While Transco's SSE Project is not subject to the Clean Air Act's PSD permitting requirements, Transco provided dispersion modeling similar to the three-step process to demonstrate that the project would not cause or contribute to any NAAQS exceedance. As described in the EA, under "Step 1," the modeled concentrations for the project are below the SILs for all pollutants and averaging periods for Compressor Station 150; therefore, no further analyses or modeling is required. Regarding Compressor Station 155, the modeled concentrations for the project are below the SILs for all pollutants and averaging periods, except for 1-hour $NO_2$. Because the 1-hour $NO_2$ SIL was exceeded for Compressor Station 155, the modeled concentrations of $NO_2$ for the 1-hour averaging period was combined with background concentrations and compared to the NAAQS under "Step Two".[208] The radius of impact for $NO_2$ would be 0.43 kilometers (about 1,411 feet).[209] This cumulative analysis demonstrated that Compressor Station 155's impacts combined with ambient background concentrations would not result in an

---

[207] *See id.*; *see also supra* note 194. *See Commonwealth LNG, LLC*, 191 FERC ¶ 61,205 at P 5 (citing 42 U.S.C. § 7475(a)(3)). As we explained in an order on remand responding to the D.C. Circuit's directive in *Healthy Gulf v. FERC*, 107 F.4th 1033 (D.C. Cir. 2024), because the 1-hour $NO_2$ SIL is an interim standard that does not provide an adequate threshold for determining the significance of cumulative effects, for purposes of the Commission staff's environmental review, any modeled NAAQS violation for 1-hour $NO_2$ with a modeled non-zero contribution by the facility is considered to potentially worsen a NAAQS exceedance. *Commonwealth LNG, LLC*, 191 FERC ¶ 61,205 at P 16.

[208] While the analysis in Step Two typically considers emissions from existing sources in addition to the project's modeled emissions at multiple receptors within the potential radius of impact, there were no other sources included in Step Two because the radius of impact was small due to the low emissions.

[209] EA at 49 & Transco February 26, 2025 Data Response at 55. The radius of impact is the distance at which the pollutant concentration exceeds the SILs.

exceedance of the NAAQS.[210]  As the courts have affirmed, the Commission may rely on compliance with the NAAQS as an appropriate measure of impacts from air emissions on public health.[211]  The EPA developed the NAAQS to protect human health, including that of sensitive populations (e.g., people with asthma or cardiovascular disease, children, the elderly, and others) to account for the latest research on health impacts.  Accordingly, it was unnecessary to move to Step 3, and the EA concluded that operation of the project would not have a significant effect on air quality.[212]  We agree.

96.     Southern Alliance also points to the proposed increases in emissions of ozone precursors, nitrogen oxides ($NO_x$) and volatile organic compounds (VOCs), at Compressor Stations 150 and 155 along with reported exceedances of the 8-hour ozone NAAQS standard at the closest ozone monitor to Station 150, the University Meadows monitor, in calling for an assessment of ozone emissions to ensure that the proposed expansion of Compressor Stations 150 and 155 would not cause or contribute to a violation of the ozone NAAQS.[213]  Further, Southern Alliance states that Transco did not model for VOCs, ozone, or secondary $PM_{2.5}$.[214]  As indicated in the EA, the project would result in additional emissions of $NO_x$ and VOC, which are ozone precursors, from Compressor Stations 150 and 155.  However, given these low modeled impacts,[215] we do not anticipate that the project would cause or contribute to any potential ozone NAAQS exceedances.  We note because Compressor Stations 150 and 155 are not major PSD sources for these ozone precursors, modeling to determine a potential 8-hour ozone impact was not required, as suggested by Southern Alliance.[216]

---

[210] EA 49 & tbl. B29.

[211] *Gulf S. Pipeline Co., LLC*, 193 FERC ¶ 61,181, at P 32, n.67 (2025); *see also Transcon. Gas Pipe Line Co., LLC*, 187 FERC ¶ 61,024 at P 60 (citing *Sierra Club v. FERC*, 867 F.3d at 1370, n.7).

[212] EA at 49.

[213] Southern Alliance December 1, 2025 Comments at 53-54.

[214] *Id.* at 55.

[215] EA at 49 and Appendix B, tbls. B28 and B29.

[216] Memorandum: Clarification on the Development of Modeled Emission Rates for Precursors (MERPs) as a Tier 1 Demonstration Tool for Ozone and PM2.5 under the PSD Permitting Program, EPA April 30, 2024.

Docket No. CP25-10-000                                                              - 44 -

### e.  Noise

97.    Several commenters express general concerns about noise associated with the project and claim that the EA did not sufficiently assess noise impacts.[217]  The EA addresses construction and operational noise effects from the project.  It also includes recommendations for noise monitoring at the Linville Lake HDD and for Transco to conduct noise surveys after placing Compressor Stations 165, 155, 150, and 145 and the Eden Regulator Station into service; these recommendations are included as Environmental Conditions 14 and 15 of this order.  The EA concludes that the noise attributable to construction and operation of the project would not cause a significant effect.[218]  We agree.

### f.  Socioeconomics and Environmental Justice

98.    Commenters state that the project threatens property values.  Ann Dorsey comments that property values along similar pipeline routes, such as the MVP Southgate path, have already declined due to anticipated environmental and safety concerns.[219]  The EA discusses factors affecting property values, including proximity to pipelines, and concludes that significant negative effects on property values are not anticipated.[220]  Accordingly, we conclude here, as we have in other cases, that the proposed project is not likely to significantly impact property values in the project area.[221]

99.    Charles Pettee expresses concern about increased road use.[222]  The EA finds that roadways in the project area have sufficient capacity to support the anticipated project use during construction and that there would not be a significant effect on the roadways.[223]  We agree.

---

[217] *See, e.g.*, Caleb Merendino November 28, 2025 Comments and Appalachian Voices December 1, 2025 Comments at 2.

[218] EA at 50-53.

[219] Ann Dorsey December 1, 2025 Comments.

[220] EA at 44.

[221] *See Transcon. Gas Pipe Line Co., LLC*, 158 FERC ¶ 61,125, at P 106 (2017); *see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 228 (2017).

[222] Charles Pettee December 1, 2025 Comments.

[223] EA at 43.

100.    Commenters express concern about effects of the project on environmental justice and disadvantaged communities.[224]  They state that Compressor Stations 150 and 155 are in environmental justice communities and that modifications to the stations would impact people who are already overburdened by air pollution.[225]

101.    Executive Orders pertaining to environmental justice were revoked in January 2025.[226]  However, the Commission continues to fulfill its NEPA responsibilities by considering impacts on all potentially affected communities.[227]  To that end, the Commission can and will continue to engage communities potentially affected by a proposed facility.  Further, the Commission will continue—as it has long done—to consider and, where appropriate, require measures to mitigate the impacts on affected communities of energy infrastructure projects subject to our jurisdiction.  In any event, as detailed above,[228] we have concluded that the project will not have significant effects on local communities.[229]

---

[224] Southern Alliance December 1, 2025 Comments at 49; Briana Strickland December 2, 2025 Comments.

[225] Isabel Oberlander November 28, 2025 Comments and North Carolina General Assembly December 1, 2025 Comments at 2-3.

[226] Exec. Order No. 14148, 90 Fed. Reg. 8237 (Jan. 20, 2025) (revoking Executive Orders 13985 and 14096); Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) (revoking Executive Order 12898).

[227] *See, e.g.*, *Bluewater Gas Storage, LLC*, 171 FERC ¶ 61,132, at PP 29-32 (2020) (analyzing alternatives and visual resources); *Adelphia Gateway, LLC*, 169 FERC ¶ 61,220, at PP 197-202 (2019) (considering air quality and public health impacts), *reh'g denied*, 171 FERC ¶ 61,049 (2020); *Dominion Transmission, Inc.*, 155 FERC ¶ 61,106, at P 106 (2016) (evaluating compressor station modeled emissions and determining they would be below a level of health concern), *reh'g denied*, 163 FERC ¶ 61,128 (2018), *petition for review dismissed sub nom.*, *Otsego 2000 v. FERC*, 767 F. App'x 19 (D.C. Cir. 2019) (mem) (per curiam); *see also* 42 U.S.C. § 4331 (setting forth NEPA's environmental protection objectives, including to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings").

[228] *Supra* PP 53-55.

[229] *See* EA at 36-38.

### g.  Reliability and Safety

102.    Multiple commenters assert that Transco has a poor safety record and express concern about the public safety risk of the project.[230]  The Commission's regulations require applicants to certify that projects under the Commission's jurisdiction would be designed, constructed, operated, and maintained in accordance with the Department of Transportation (DOT) Pipeline and Hazardous Materials Safety Administration (PHMSA) Minimum Federal Safety Standards in 49 CFR 192, which are specifically designed to protect pipeline operators and the public.  The Commission accepts this certification and does not impose additional safety standards.[231]  The EA concludes that the project would represent a minimal increase in risk to the nearby public.[232]  We agree.

103.    Southern Alliance alleges that the EA failed to address safety concerns associated with multiple co-located high pressure pipelines.[233]  It further notes that Transco has acknowledged safety issues associated with co-location in other proceedings and that those same concerns apply to the SSE Project and should be addressed.[234]

104.    Under a Memorandum of Understanding on Natural Gas Transportation Facilities dated January 15, 1993, between DOT and the Commission, DOT has the exclusive authority to promulgate federal safety standards used in the transportation of natural gas.[235]  If the Commission becomes aware of an existing or potential safety problem, there is a provision in the 1993 memorandum to promptly alert DOT.  The DOT Pipeline Safety Regulations require operators to develop and follow an integrity management program that addresses the risks on each transmission pipeline segment.[236]  Transco would follow its integrity management program which includes safety measures and

---

[230] *See, e.g.*, Southern Alliance December 1, 2025 Comments at 61; Christopher Mattox November 24, 2025 Comments.

[231] EA at 54.

[232] *Id.* at 55.

[233] Southern Alliance December 1, 2025 Comments at 66.

[234] *Id.* at 62-64.

[235] Memorandum of Understanding on Natural Gas Transportation Facilities, Jan. 15, 1993.

[236] EA at 55.

compliance monitoring along its pipeline systems.[237]   Collocation of proposed pipelines with existing or other proposed pipelines is common and generally decreases environmental impacts due to the minimization of new corridors.  As noted above, EA concludes that the project would represent a minimal increase in risk to the nearby public, and we agree.

105.    Southern Alliance notes inconsistencies in Appendix G of the EA (Additional Pipeline Safety Information).[238]  Tables G3 and G4 are incorrectly numbered as G1 and G2, respectively, although the text referencing them is correct.  Additionally, table G3 indicates no injuries and fatalities related to natural gas transmission systems for 2023, whereas table G4 lists 17 fatalities and 31 injuries for gas transmission pipelines for that year.  Table G3 presents the annual fatalities and injuries on natural gas transmission lines and does not include local distribution pipelines, which are not regulated by the Commission.  We clarify that table G4 presents the annual fatalities and injuries on "gas transmission pipelines," which does include distribution pipelines and should have been labeled more generally as "gas pipelines."  This labeling oversight does not materially change the information conveyed in table G4, which is a comparison of fatalities and injuries by transportation mode in 2023.  We conclude that these minor discrepancies do not affect the substance of the information presented or the EA's conclusions regarding pipeline safety.

### h.  Cumulative Effects

106.    Many commenters state that the cumulative effects of the Eden Loop's co-location with MVP's Southgate Amendment Project are not considered or are inadequately analyzed in the EA.[239]  More specifically, some commenters state that waterbodies (such as Banister River, Sandy River, and tributaries of the Dan River) would be crossed by both projects, and some would be crossed multiple times, compounding adverse effects.[240]  Southern Alliance states that the EA fails to assess cumulative impacts on

---

[237] *Id.*

[238] Southern Alliance December 1, 2025 Comments at 66.

[239] *See, e.g.*, Southern Alliance December 1, 2025 Comments at 36; POWHR December 1, 2025 Comments at 1; Virginia General Assembly November 18, 2025 Comments at 2; Reps. Scott, Forshee, and McClellan December 1, 2025 Comments at 1-2.

[240] *See, e.g.*, Appalachian Voices December 1, 2025 Comments at 2; Virginia General Assembly November 18, 2025 Comments at 2; Southern Alliance December 1, 2025 Comments at 35.

waterways from other projects, such as Enbridge's T15 Reliability Project.[241]  Several commenters note that the Dan River is still recovering from a coal ash spill in 2014.[242]

107.    The EA provides an analysis of cumulative effects of the project when considered with other projects within the geographic scope of the project, including MVP's Southgate Amendment Project and Enbridge's T15 Reliability Project.[243]  As reported in the EA, the Eden Loop's overlapping timeline of anticipated construction and acreage of shared and adjacent workspace with the Southgate Amendment Project would have the highest potential for cumulative effects.[244]  Due to this, potential cumulative effects of the Eden Loop and Southgate Amendment Project are discussed in detail.  The EA concludes that the project, when combined with other actions in the geographic and temporal scope, would not have a significant cumulative effect on surface waters and wetlands.[245]  We agree.  Additionally, we note that, as described in the EA,[246] the Dan River, Banister River, and Sandy River would be crossed using HDD, thereby avoiding direct effects.

### i.    Climate Change

108.    Commenters express concerns regarding climate change and the use of fossil fuels.  Several commenters also allege that the EA understates impacts of GHG emissions, and note that the Commission did not make a significance determination regarding GHG emissions.[247]

109.    The EA acknowledges that project construction and operation would increase the atmospheric concentration of GHG in combination with past, current, and future emissions from all other sources globally, and would contribute incrementally to future

---

[241] Southern Alliance December 1, 2025 Comments at 37.

[242] Caleb Merendino November 28, 2025 Comments; Appalachian Voices December 1, 2025 Comments at 2; POWHR December 1, 2025 Comments at 2.

[243] EA at 56.

[244] *Id.* at 57.

[245] *Id.* at 60.

[246] *Id.* at 19.

[247] *See, e.g.*, Appalachian Voices December 1, 2025 Comments at 2; Brittany Jacobsen November 19, 2025 Comments; Southern Alliance December 1, 2025 Comments at 66-72.

climate change impacts.[248]  However, to date, the Commission has not identified a way to estimate discrete, quantifiable, physical impacts on the environment resulting from the project's incremental contribution to GHGs.[249]  Without the ability to determine discrete resource impacts, the Commission is unable to assess the project's contribution to climate change through any objective analysis of physical impact attributable to the project.[250]  Accordingly, we have fulfilled our obligation under NEPA to consider and disclose the environmental impacts of the project.

### j.  Alternatives

110.   Southern Alliance states that the EA defines the purpose of the project so narrowly that any non-gas or partial-gas alternative is ruled out at the threshold.[251]  Other commenters state that the EA failed to consider a reasonable range of alternatives and request that the Commission conduct a thorough analysis of the No-Action Alternative.[252]  Southern Alliance also alleges that staff's analysis in the EA of the collocated SSE Project Eden Loop and MVP Southgate Amendment Project did not consider whether authorizing both projects separately is significantly environmentally worse than authorizing only one project.[253]  Commenters further request that the Commission prepare a comparative analysis of the environmental consequences of various scenarios in which the project and/or the MVP Southgate Amendment Project are or are not constructed.

111.   NEPA provides that agencies include "a detailed statement" of a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose

---

[248] EA at 68.

[249] *Id.*

[250] *Id.*; *see also Seven Cnty.*, 605 U.S. at 188-90; *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173, at P 93 (2023), *remanded on other grounds*, *Healthy Gulf v. FERC*, 107 F.4th at 1040 (concluding the Commission adequately explained why it could not determine whether a project's GHG emissions were significant); *Tres Palacios Gas Storage, LLC*, 185 FERC ¶ 61,094, at P 58 (2023).

[251] Southern Alliance December 1, 2025 Comments at 14-15.

[252] *See, e.g.*, Brittany Jacobsen November 19, 2025 Comments and Chesapeake Climate Action Network December 1, 2025 Comments at 1.

[253] Southern Alliance December 1, 2025 Comments at 10-11.

and need of the proposal.[254]  An agency uses the purpose and need statement to define the objectives of a proposed action and then to identify and consider reasonable alternatives. When an agency is asked to consider a specific proposal, the needs and goals of the applicant should be taken into account.[255]  Where, as here, a federal agency is not the sponsor of a project, "the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project."[256]

112.    Commission staff explained in the EA that the purpose of the SSE Project is to provide an incremental 1,596,900 Dth/d of year-round firm transportation capacity from Transco's existing Station 165 Zone 5 Pooling Point and the Cherrystone Interconnect to growing natural gas markets in the southeastern United States.[257]  Courts have found that a statement of purpose and need for a Commission-jurisdictional natural gas pipeline project that identifies the natural gas transportation path and required capacities, allows for a sufficiently wide range of alternatives but is narrow enough that there are not an infinite number of alternatives.[258]

113.    The EA includes an assessment of the No-Action Alternative, several system and design alternatives, and minor route alternatives.[259]  The MVP Southgate Amendment Project was considered as a system alternative for the project and environmental impacts

---

[254] 42 U.S.C. § 4332(c)(iii); *see Seven Cnty.*, 605 U.S. at 181-82 (explaining that agencies are entitled to substantial deference in assessing alternatives, including what alternatives qualify as feasible.).

[255] *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,047, at P 48 (2024).

[256] *See, e.g.*, *City of Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d at 199 (explaining that the evaluation of alternatives is "shaped by the application at issue and by the function that the agency plays in the decisional process.").

[257] EA at 1.

[258] *Sierra Club, Inc. v. U. S. Forest Serv.*, 897 F.3d 582, 599 (4th Cir. 2018) (explaining that the purpose and need statement was sufficient when "it explains where the gas must come from, where it will go, [and] how much it would deliver").

[259] EA at 71-74.

of the construction of both projects are described in the EA.[260]  The EA concluded that the SSE Project is the preferred alternative to meet the project objectives.[261]

114.     The EA explicitly considered and rejected the No-Action Alternative in a manner consistent with NEPA.[262]  An agency does not err by rejecting a No-Action Alternative that would not fulfill the project's purpose.[263]  Because the No-Action alternative would fail to meet the project's purpose and need, we continue to find that the discussion and rejection of the No-Action Alternative was reasonable and appropriate.[264]

115.     Commenters note that Transco has proposed natural gas-fired compressor units rather than electric motor-driven compressors at Compressor Stations 150 and 155 in North Carolina, despite proposing electric motor-driven compressors at Compressor Stations 145 and 165.[265]  Southern Alliance asserts that the EA's assessment of electric motor-driven versus natural gas-fired compressors at Compressor Stations 150 and 155 is legally and analytically deficient because:  (1) the EA applies a "significant environmental advantage" test, which prematurely screens out electric motor-driven alternatives without a full accounting of localized air-quality, noise, and public-health benefits at the compressor station fence line and in nearby communities; (2) the EA fails to evaluate electric motor-driven alternatives in light of the changing grid mix and state policy commitments; and (3) the EA's analysis of electric motor-driven alternatives is purely qualitative with regards to land-use and community impacts.[266]  The EA considers

---

[260] *Id.* at 56-70; *id.* at 73 (explaining that the MVP Southgate Amendment Project, as amended, would not have capacity to transport an incremental 1,596,900 Dth/d of natural gas to meet the need for the SSE Project without significant design alteration and would not present a significant environmental advantage).

[261] *Id.* at 74.

[262] *Id.* at 71.

[263] *Alaska LNG*, 67 F.4th 1176, 1182 (D.C. Cir. 2023) (holding that the Commission did not err by concisely rejecting the no-action alternative when it would not fulfill the project's purpose to commercialize natural gas from Alaska's North Slope).

[264] *See Seven Cnty.*, 605 U.S. at 181-82 (explaining that agencies are entitled to substantial deference in assessing alternatives, including what alternatives qualify as feasible.).

[265] Sierra Club December 1, 2025 Comments at 2; Southern Alliance December 1, 2025 Comments at 13.

[266] Southern Alliance December 1, 2025 Comments at 14-15.

whether electric motor-driven compression at Compressor Stations 150 and 155 would offer a significant environmental advantage.[267] Based on calculations using the EPA's AVoided Emissions and geneRation Tool (AVERT), emissions from the electric grid associated with electric motor-driven compressor units at Compressor Stations 150 and 155 would be greater than use of natural gas turbines, with the exception of volatile organic compounds, which would be 14 percent less.[268] Southern Alliance argues that the AVERT system is flawed because it fails to consider projected emissions reductions from electric generation, but NEPA does not require new scientific and technical research or the development of new methodologies.[269] Southern Alliance also claims that staff's analysis obscures localized benefits.[270] While we acknowledge this alternative would reduce adverse emissions impacts to nearby communities, as discussed, these emissions are not expected to be significant.[271] Additionally, use of electric motor-driven compressor units at Compressor Station 155 would require construction of new overhead power lines and a new electrical substation, which would result in land disturbance, tree clearing, and effects on landowners. While Southern Alliance argues that we are required to quantify these impacts,[272] it is reasonable to rely on this qualitative assessment.[273] Based on this assessment, the EA concludes that use of electric motor-driven compressor units would not present a significant environmental advantage compared to the proposed natural gas-fired turbines at Compressor Stations 150 and 155.[274] We agree.

116.    Several commenters suggest that the Commission should consider and support renewable forms of energy, and allege that renewable energy alternatives were not

---

[267] EA at 73.

[268] Application, Resource Report 10, Tables 10.8-1 & 10.8-2-1.

[269] 42 U.S.C. § 4336(b)(3)(B). *See Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024, at P 74 (2024) ("In carrying out its NEPA responsibilities, Commission staff relies on other agencies' expertise, including that of the EPA . . . , which establish[es] methodologies and standards for assessing air quality impacts").

[270] Southern Alliance December 1, 2025 Comments at 14.

[271] *See supra* P 88.

[272] Southern Alliance December 1, 2025 Comments at 15.

[273] *Food & Water Watch v. FERC*, 104 F.4th at 346 (upholding the Commission's practice not to make a binary significance determination for GHG emissions and to instead rely on a qualitative discussion of the potential adverse effects).

[274] EA at 73.

seriously evaluated as alternatives in the EA.[275]  The purpose of the project is to transport natural gas, and the generation of electricity from renewable energy sources or the gains realized from increased energy efficiency and conservation are not natural gas transportation alternatives.  They cannot function as a substitute for the project and were therefore not considered further in the EA's analysis.[276]  The Commission recognizes that energy conservation and efficiency programs help to reduce energy demand and that renewable energy is playing an increasing role in meeting the region's energy needs.  This, however, is outside of the scope of the Commission's NEPA responsibilities because the goal of the EA is to disclose the environmental impacts of this project, not to speculate about future energy consumption patterns and scenarios.[277]  The Commission does not regulate states' chosen mix of energy generation resources.[278]

### 3.     Environmental Analysis Conclusion

117.   We have reviewed the information and analysis contained in the EA, as well as the other information in the record, regarding potential environmental effects of the project.  We accept the environmental recommendations in the EA, as modified herein, and are including them as conditions in an appendix to this order.  Based on the analysis in the EA, as supplemented herein, we conclude that if constructed and operated in accordance with Transco's application and supplements, and in compliance with the environmental conditions in the appendix to this order our approval of this proposal would not constitute a major federal action significantly affecting the quality of the human environment.[279]

118.   Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental effects of approved projects are consistent with those anticipated by our environmental analyses.  Thus, Commission staff carefully reviews all information submitted.  Only when satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever

---

[275] *See, e.g.*, Brittany Jacobsen November 19, 2025 Comments and Kay Reibold November 24, 2025 Comments.

[276] EA at 71.

[277] *See generally Citizens Action Coal. v. FERC*, 125 F.4th at 238 (upholding the Commission's NEPA analysis and finding that the Commission "properly refused to reconsider the mix of electricity generation chosen").

[278] *Id.* at 239.

[279] We are not making a significance determination regarding GHG effects for the reasons discussed.  *Supra* note 94.

steps are necessary to ensure the protection of environmental resources during construction and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental effects resulting from project construction and operation.

## V.     **Conclusion**

119.    We find that Transco has demonstrated a need for the proposed project, which will provide 1,596,900 Dth/d of firm transportation service.  Further, the project will not have adverse impacts on Transco's existing shippers or other pipelines and their existing customers, and the project's benefits will outweigh any adverse effects on landowners and surrounding communities.  The Commission recognizes that the proposed project would impact the environment and individuals living in the vicinity of the project facilities, but that the project impacts, as mitigated, would not be significant.  Based on the discussion above, we conclude that, under section 7 of the NGA that, the public convenience and necessity requires approval of project, subject to the conditions in this order.  Further, as discussed above, we find that the public convenience or necessity permits the abandonment.

120.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  The Commission encourages cooperation between interstate pipelines and local authorities.  However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[280]

121.    The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, as supplemented, and exhibits thereto, and all comments, and upon consideration of the record,

---

[280] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers,* 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

Document Accession #: 20260129-3076     Filed Date: 01/29/2026

Docket No. CP25-10-000                                                           - 55 -

The Commission orders:

(A)     A certificate of public convenience and necessity is issued to
Transcontinental Gas Pipe Line, LLC (Transco), authorizing it to construct and operate
the Southeast Supply Enhancement Project, as described and conditioned herein, and as
more fully described in the application and subsequent filings by the applicant, including
any commitments made therein.

(B)     The certificate authority issued in ordering paragraph (A) is conditioned on
Transco's:

(1)     completing construction of the proposed facilities and making them
available for service within two years of the date of this order
pursuant to section 157.20(b) of the Commission's regulations;

(2)     complying with all applicable Commission regulations under the
NGA including, but not limited to, Parts 154, 157, and 284, and
paragraphs (a), (c), (e), and (f) of section 157.20 of the
Commission's regulations;

(3)     complying with the environmental conditions listed in the appendix
to this order; and

(4)     making a filing affirming that it has executed firm service
agreements for volumes and service terms equivalent to those in the
precedent agreements before commencing construction.

(C)     Transco is granted permission and approval to abandon the facilities
described in this order and more fully described in the application, subject to Transco's
compliance with environmental conditions listed in the appendix to this order.

(D)     Transco shall complete the authorized abandonment within two years from
the date of this order.

(E)     Transco shall notify the Commission within 10 days of the abandonment of
the facilities.

(F)     Transco shall charge its system rate for service on the project, as more fully
discussed above.

(G)     Transco's proposal to apply its generally applicable system fuel retention
and electric power rates to the project is approved.

(H)     Transco is granted a predetermination to roll the costs of the project into its

Docket No. CP25-10-000                                                                - 56 -

system rates in a future NGA section 4 rate case, absent a significant change in circumstances.

     (I)    Transco shall keep separate books and accounting of costs attributable to the project, as more fully described above.

     (J)    Transco shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Transco.  Transco shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

     (K)    The December 22, 2025, motion to lodge is denied, as described in the body of this order.

By the Commission.

( S E A L )

Debbie-Anne A. Reese,
Secretary.

Docket No. CP25-10-000                                                      - 57 -

## Appendix
## Environmental Conditions


As recommended in the Environmental Assessment (EA) and modified herein, this authorization includes the following conditions:

1.  Transcontinental Gas Pipe Line Company, LLC (Transco) shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EA, unless modified by the Order.  Transco must:
    a.  request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);
    b.  justify each modification relative to site-specific conditions;
    c.  explain how that modification provides an equal or greater level of environmental protection than the original measure; and
    d.  receive approval in writing from the Director of the Office of Energy Projects (OEP), or the Director's designee, **before using that modification**.

2.  The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the Project.  This authority shall allow:
    a.  the modification of conditions of the Order;
    b.  stop-work authority; and
    c.  the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental effects resulting from Project construction and operation.

3.  **Prior to any construction**, Transco shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EI), and contractor personnel would be informed of the EI's authority and have been or would be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction, abandonment, and restoration activities.

4.  The authorized facility locations shall be as shown in the EA, as supplemented by filed alignment sheets.  **As soon as they are available, and before the start of construction**, Transco shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order.  All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

Transco's exercise of eminent domain authority granted under Natural Gas Act (NGA) section 7(h) in any condemnation proceedings related to the Order must be consistent with these authorized facilities and locations. Transco's right of eminent domain granted under NGA section 7(h) does not authorize it to increase the size of its natural gas facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.  Transco shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area**.

    This requirement does not apply to extra workspace allowed by the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

    Examples of alterations requiring approval include all route realignments and facility location changes resulting from:
    a.  implementation of cultural resources mitigation measures;
    b.  implementation of endangered, threatened, or special concern species mitigation measures;
    c.  recommendations by state regulatory authorities; and
    d.  agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.  **Within 60 days of the acceptance of the authorization and before construction begins**, Transco shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee. Transco must file revisions to the plan as schedules change. The plan shall identify:
    a.  how Transco would implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EA, and required by the Order;
    b.  how Transco would incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to on- site construction and inspection personnel;

     c.     the number of EIs assigned per spread, and how the company would ensure that sufficient personnel are available to implement the environmental mitigation;

     d.     company personnel, including EIs and contractors, who would receive copies of the appropriate material;

     e.     the location and dates of the environmental compliance training and instructions Transco would give to all personnel involved with construction and restoration (initial and refresher training as the Project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

     f.     the company personnel (if known) and specific portion of Transco's organization having responsibility for compliance;

     g.     the procedures (including use of contract penalties) Transco would follow if noncompliance occurs; and

     h.     for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

          i.     the completion of all required surveys and reports;

          ii.     the environmental compliance training of on-site personnel;

          iii.     the start of construction; and

          iv.     the start and completion of restoration.

7.     Transco shall employ at least one EI per construction spread.  The EIs shall be:

     a.     responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

     b.     responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

     c.     empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

     d.     a full-time position, separate from all other activity inspectors;

     e.     responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

     f.     responsible for maintaining status reports.

8.     Beginning with the filing of its Implementation Plan, Transco shall file updated status reports with the Secretary on a **biweekly** basis until all construction and restoration activities are complete.   On request, these status reports would also be provided to other federal and state agencies with permitting responsibilities.   Status reports shall include:

     a.     an update on Transco's efforts to obtain the necessary federal authorizations;

b. the construction status of the Project, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

c. a listing of all problems encountered and each instance of noncompliance observed by the EIs during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

d. a description of the corrective actions implemented in response to all instances of noncompliance;

e. the effectiveness of all corrective actions implemented;

f. a description of any landowner/resident complaints which may relate to compliance with the requirements of the Order, and the measures taken to satisfy their concerns; and

g. copies of any correspondence received by Transco from other federal, state, or local permitting agencies concerning instances of noncompliance, and Transco's response.

9. Transco must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction or abandonment activities of any Project facilities**. To obtain such authorization, Transco must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

10. Transco must receive written authorization from the Director of OEP, or the Director's designee, **before placing the Project into service**. Such authorization would only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the Project are proceeding satisfactorily.

11. **Within 30 days of placing the authorized facilities in service**, Transco shall file an affirmative statement with the Secretary, certified by a senior company official:

a. that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities would be consistent with all applicable conditions; or

b. identifying which of the conditions in the Order Transco has complied with or would comply with. This statement shall also identify any areas affected by the Project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

12. All conditions attached to the water quality certifications issued by the Virginia Department of Environmental Quality and the North Carolina Department of Environmental Quality constitute mandatory conditions of the Certificate Order. Prior to construction, Transco shall file, for review and written approval of the Director of OEP, or the Director's designee, any revisions to its project design necessary to comply with the water quality certification conditions.

13. Transco shall **not begin** construction of facilities and/or use of all staging, storage, or temporary work areas and new or to-be-improved access roads **until**:
    a. Transco files with the Secretary comments on the cultural resources reports and plans from the Virginia, North Carolina, South Carolina, and Alabama State Historic Preservation Offices and/or Tribes, as applicable;
    b. the Advisory Council on Historic Preservation is afforded an opportunity to comment if historic properties would be adversely affected; and
    c. the FERC staff reviews and the Director of OEP, or the Director's designee, approves the cultural resources reports and plans, and notifies Transco in writing that treatment plans/mitigation measures may be implemented and/or construction may proceed.

    All materials filed with the Commission containing location, character, and ownership information about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering:  **"CUI//PRIV- DO NOT RELEASE."**

14. **During nighttime construction activities between 7:00 p.m. and 7:00 a.m. at the Linville Lake HDD site,** Transco shall monitor noise levels, document the noise levels in the **biweekly** status reports, and restrict the noise attributable to nighttime construction activities to no more than an day-night average sound level ($L_{dn}$) of 55 decibels on the A-weighted scale (dBA) decibels on the A-weighted scale (dBA) (48.6 dBA equivalent sound level [$L_{eq}$]) at noise sensitive areas.

15. Transco shall file a noise survey with the Secretary **no later than 60 days** after placing the modified Compressor Stations 165, 155, 150, and 145 and Eden Regulator Station in service.  If a full power load condition noise survey is not possible, Transco shall provide an interim survey at maximum possible horsepower load and provide the full load survey **within 6 months**.  If the noise attributable to the operation of the equipment at the stations under interim or full horsepower load conditions exceeds an $L_{dn}$ of 55 dBA at any nearby noise sensitive areas, Transco shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within 1 year** of the in-service date.  Transco shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

Document Content(s)

CP25-10-000.docx...................................................1

# Exhibit B

Document Accession #: 20260402-3008          Filed Date: 04/02/2026

195 FERC ¶ 62,007
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Transcontinental Gas Pipe Line, LLC                    Docket No. CP25-10-001

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(April 2, 2026)

Rehearing has been timely requested of the Commission's January 29, 2026 order issuing Transcontinental Gas Pipeline Co. LLC (Transco) a certificate of public convenience and necessity and authorizing abandonment for its Southeast Supply Enhancement Project, *Transcontinental Gas Pipe Line Co.*, 194 FERC ¶ 61,078 (2026) and the Commission's February 25, 2026 unpublished letter order authorizing Transco's request to commence construction of the project. *Transcontinental Gas Pipe Line Co.*, Docket No. CP25-10-000 (Feb. 25, 2026) (delegated order). In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 15 U.S.C. § 717r(a); 18 C.F.R. § 385.713 (2025); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 15 U.S.C. § 717r(a), the requests for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 15 U.S.C. § 717r(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.

Debbie-Anne A. Reese,
Secretary.

Document Content(s)

CP25-10-001.docx...............................................................1

# Exhibit C

# Service List for CP25-10 Transcontinental Gas Pipe Line Company, LLC

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| Robert McNutt | Robert McNutt<br>301 DUNHILL DR<br>DURHAM, NORTH CAROLINA 27713<br>UNITED STATES<br>rwmcnutt@mindspring.com | |
| Katie Whitehead | Katie Whitehead<br>PO BOX 947<br>CHATHAM, VIRGINIA 24531<br>UNITED STATES<br>mkwhitehead@yahoo.com | |
| Ronald Ray | Ronald Ray<br>8478 STAFFORD MILL RD<br>OAK RIDGE, NORTH CAROLINA 27310<br>UNITED STATES<br>ronray77@gmail.com | |
| Nancy LaPlaca | Nancy LaPlaca<br>Principal<br>239 WILDWOOD LN<br>BOONE, NORTH CAROLINA 28607<br>UNITED STATES<br>laplaca.nancy@gmail.com | |
| Maury Johnson | Maury Johnson<br>Mr.<br>3227 Ellison's Ridge<br>Greenville, WEST VIRGINIA 24945 | |

| | | |
|---|---|---|
| | UNITED STATES<br>maurywjohnson@yahoo.com | |
| Brenda Chaney | Brenda Chaney<br>5811 Billet Rd<br>OAK RIDGE, NORTH CAROLINA 27310<br>UNITED STATES<br>BKCee67@gmail.com | |
| Rachel Chaney | Rachel Chaney<br>5804 BILLET RD<br>OAK RIDGE, NORTH CAROLINA 27310<br>UNITED STATES<br>rachaney326@gmail.com | |
| Maple Osterbrink | Maple Osterbrink<br>603 MLK Blvd<br>Chapel Hill, NORTH CAROLINA 27514<br>UNITED STATES<br>maosterbrink@gmail.com | |
| Aleksandra Gill | Aleksandra Gill<br>8548 BENBOW MERRILL RD<br>OAK RIDGE, NORTH CAROLINA 27310<br>UNITED STATES<br>agoodell@gmail.com | |
| 7 Directions of Service | Crystal Cavalier<br>7 Directions of Service<br>5123 N NC HIGHWAY 119<br>MEBANE, NORTH CAROLINA 27302<br>UNITED STATES<br>crystal@7directionsofservice.com | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27048<br>1goodolefarmer@gmail.com |

| | | |
|---|---|---|
| 7 Directions of Service | Elizabeth Putfark<br>Southern Environmental Law Center<br>120 Garrett Street<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>eputfark@selcva.org | |
| American Gas Association | Matthew Agen<br>Chief Reg. Counsel, Energy<br>American Gas Association<br>400 N. Capitol Street, NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>magen@aga.org | Katherine Herrera<br>Senior Regulatory Policy Analy<br>American Gas Association<br>400 N. Capitol Street, NW<br>Washington, DISTRICT OF COLUMBIA 20001<br>kherrera@aga.org |
| AMERICAN PETROLEUM INSTITUTE | Grace Soderberg<br>Senior Counsel<br>AMERICAN PETROLEUM INSTITUTE<br>200 MASSACHUSETTS AVE NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>soderbergg@api.org | |
| Appalachian Voices | Peter Anderson<br>Appalachian Voices<br>812 E High St<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>peter@appvoices.org | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27048<br>1goodolefarmer@gmail.com |
| Appalachian Voices | Elizabeth Putfark<br>Appalachian Voices<br>120 Garrett Street | |

| | | |
|---|---|---|
| | Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>eputfark@selcva.org | |
| Archer Consulting Services LLC | Brentley Archer<br>Archer Consulting Services LLC<br>14265 AMAJESS LN<br>MIDLOTHIAN, VIRGINIA 23113<br>UNITED STATES<br>barch@archerconsults.com | |
| Atlanta Gas Light Company | Elizabeth Wade<br>Senior Counsel<br>Southern Company Gas<br>10 PEACHTREE PL NE<br>ATLANTA, GEORGIA 30309<br>UNITED STATES<br>ferclegal@southernco.com | |
| Center for LNG | Intervenor NGSA<br>NATURAL GAS SUPPLY ASSOCIATION<br>900 17th Street NW<br>Suite 500<br>Washington, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>intervenor@ngsa.org | |
| Chesapeake Climate Action Network | Anne Havemann<br>General Counsel<br>Chesapeake Climate Action Network<br>6930 Carroll Ave.<br>Suite 720<br>Takoma Park, MARYLAND 20912 | |

| | | |
|---|---|---|
| | UNITED STATES<br>anne@chesapeakeclimate.org | |
| Chevron U.S.A. Inc. | Kevin Sweeney<br>Law Office of Kevin M. Sweeney<br>1717 K Street, NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>ksweeney@kmsenergylaw.com | Jay Dibble<br>Senior Regulatory Advisor<br>Chevron U.S.A. Inc.<br>1500 Louisiana Street<br>Third Floor<br>HOUSTON, TEXAS 77002<br>Jay.Dibble@Chevron.com |
| Chevron U.S.A. Inc. | | Matthijs Nieuwveld<br>Senior Counsel<br>Chevron U.S.A. Inc.<br>Shipping and Supply & Trading Law<br>1400 Smith Street<br>Houston, TEXAS 77002<br>matthijs.nieuwveld@chevron.com |
| City of Wilson - Wilson Energy | John Maclaga<br>Director of Wilson Energy<br>City of Wilson - Wilson Energy<br>PO BOX 10<br>1800 HERRING AVENUE<br>WILSON, NORTH CAROLINA 27894<br>UNITED STATES<br>jmaclaga@wilsonnc.org | |
| Duke Energy Carolinas, LLC and Duke Energy Progress, LLC | Mindy McGrath<br>Troutman Pepper Locke LLP<br>301 S. College Street<br>34th Floor<br>Charlotte, NORTH CAROLINA 28202<br>UNITED STATES<br>mindy.mcgrath@troutman.com | Brian S. Heslin<br>Deputy General Counsel<br>Duke Energy Corporation<br>550 S. Tryon St.<br>(DEC45A)<br>Charlotte, NORTH CAROLINA 28202<br>brian.heslin@duke-energy.com |

| | | |
|---|---|---|
| Duke Energy Carolinas, LLC and Duke Energy Progress, LLC | Alex Spratley<br>Troutman Pepper Locke LLP<br>301 S. College Street<br>34th Floor<br>Charlotte, NORTH CAROLINA 28202<br>UNITED STATES<br>alex.spratley@troutman.com | Lee Mitchell<br>Duke Energy Business Services, LLC<br>526 S CHURCH ST<br>EC02F<br>CHARLOTTE, NORTH CAROLINA 28202<br>lee.mitchell@duke-energy.com |
| Duke Energy Carolinas, LLC and Duke Energy Progress, LLC | | William Simmerson<br>Associate General Counsel<br>Duke Energy Corporation<br>411 Fayetteville Street<br>Raleigh, NORTH CAROLINA 27601<br>william.simmerson@duke-energy.com |
| Georgia Interfaith Power and Light | Codi Norred<br>Georgia Interfaith Power & Lig<br>Georgia Interfaith Power & Light<br>326 S COLUMBIA DR<br>DECATUR, GEORGIA 30030<br>UNITED STATES<br>codi@gipl.org | |
| Good Stewards of Rockingham - Dan Riverkeeper | Gary Purgason<br>Good Stewards of Rockingham<br>Good Stewards of Rockingham - Dan Riverkeeper<br>790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27048<br>UNITED STATES<br>1goodolefarmer@gmail.com | |
| Haw River Assembly | Emily Sutton<br>Haw Riverkeeper<br>Haw River Assembly<br>2602 SAXAPAHAW<br>BETHLEHEM CH RD | |

| | | |
|---|---|---|
| | GRAHAM, NORTH CAROLINA 27253<br>UNITED STATES<br>emily@hawriver.org | |
| Lexington Area Chamber of Commerce | Joe Wallace<br>Lexington Area Chamber of Commerce<br>507 E CENTER ST<br>LEXINGTON, NORTH CAROLINA 27292<br>UNITED STATES<br>jwallace@lexingtonchamber.net | |
| Mountain Valley Pipeline, LLC | Jennifer Brough<br>Partner<br>Sheppard Mullin Richter & Hampton LLP<br>Four Embarcadero Center<br>17th Floor<br>San Francisco, CALIFORNIA 94111-4109<br>UNITED STATES<br>JBrough@sheppard.com | |
| Municipal Gas Authority of Georgia | Philip Mone<br>Attorney<br>McCarter & English, LLP<br>1301 K Street NW<br>Ste 1000 West<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>pmone@mccarter.com | Arthur C Corbin<br>President and CEO<br>104 TownPark Drive<br>Kennesaw, GEORGIA 30144<br>Multnomah<br>acorbin@gasauthority.com |
| Municipal Gas Authority of Georgia | James Byrd<br>McCarter & English, LLP<br>1301 K Street N.W.<br>Suite 1000 West<br>Washington, DISTRICT OF | |

| | | |
|---|---|---|
| | COLUMBIA 20005<br>UNITED STATES<br>jbyrd@mccarter.com | |
| National Grid Gas Delivery Companies | Gregory Simmons<br>Partner<br>Cullen and Dykman LLP<br>1101 14th Street, NW<br>Suite 750<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>gsimmons@cullenllp.com | Kenneth T Maloney<br>Cullen and Dykman<br>1101 Fourteenth Street, N.W.<br>Suite 750<br>Washington, DISTRICT OF COLUMBIA 20005<br>kmaloney@cullenllp.com |
| National Grid Gas Delivery Companies | | Amber Thornhill<br>Director, FERC, ISO Relations<br>National Grid<br>801 Pennsylvania Ave., N.W<br>Suite 801<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>Amber.Thornhill@nationalgrid.com |
| National Grid Gas Delivery Companies | | Andrew MacBride<br>Director, Wholesale Market Str<br>National Grid<br>170 Data Drive<br>Waltham, MASSACHUSETTS 02451<br>andrew.macbride@nationalgrid.com |
| National Grid Gas Delivery Companies | | Samara A Jaffe<br>Program Manager<br>National Grid Gas Delivery Companies<br>100 East Old Country Rd<br>Hicksville, NEW YORK 11021<br>samara.jaffe@nationalgrid.com |

| | | |
|---|---|---|
| National Grid Gas Delivery Companies | | Patrick J. Tarmey<br>Senior Counsel<br>National Grid<br>170 Data Drive<br>Waltham, MASSACHUSETTS 02451<br>patrick.tarmey@nationalgrid.com |
| National Grid Gas Delivery Companies | | Jonathan Bernstein<br>NationalGrid USA<br>2 Hanson Place, 11th floor<br>BROOKLYN, NEW YORK 11217<br>Jonathan.Bernstein@nationalgrid.com |
| National Wildlife Federation | Adrienne Hollis<br>National Wildlife Federation<br>11100 WILDLIFE CENTER DR<br>RESTON, VIRGINIA 20190<br>UNITED STATES<br>hollisa@nwf.org | |
| Natural Resources Defense Council | Caroline Reiser<br>Senior Staff Attorney<br>Natural Resources Defense Council<br>1152 15th Street, NW<br>Suite 300<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>creiser@nrdc.org | Gillian Giannetti<br>Director and Senior Attorney,<br>Natural Resources Defense Council<br>1152 15th Street, NW<br>Suite 300<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>ggiannetti@nrdc.org |
| NC Sierra Club - Piedmont Plateau Group | Karen Katula<br>Karen Katula<br>2100 FOREST HAVEN DR<br>CLIMAX, NORTH CAROLINA 27233<br>UNITED STATES<br>kkatula@gmail.com | |

| | | |
|---|---|---|
| New Jersey Natural Gas Company | William Scharfenberg<br>Attorney<br>NJR Service Corporation<br>PO Box 1415<br>Wall,NEW JERSEY 07719<br>UNITED STATES<br>wscharfenberg@njresources.com | Kathryn Ferreira<br>New Jersey Natural Gas Company<br>1415 Wyckoff Road<br>Wall, NEW JERSEY 07719<br>kferreira@njresources.com |
| New Jersey Natural Gas Company | | Jessica Tarbox<br>Rate & Regulatory Analyst<br>New Jersey Resources Corporation<br>PO Box 1415<br>Wall, NEW JERSEY 07719<br>jtarbox@njresources.com |
| NJR Energy Services Company, LLC | William Scharfenberg<br>Attorney<br>NJR Service Corporation<br>PO Box 1415<br>Wall,NEW JERSEY 07719<br>UNITED STATES<br>wscharfenberg@njresources.com | Angel A Velez<br>Director, Operations & Asset O<br>New Jersey Resources Corporation<br>1415 Wyckoff Road<br>Wall, NEW JERSEY 07719<br>avelez@njresources.com |
| NJR Energy Services Company, LLC | | Jessica Tarbox<br>Rate & Regulatory Analyst<br>New Jersey Resources Corporation<br>PO Box 1415<br>Wall, NEW JERSEY 07719<br>jtarbox@njresources.com |
| North Carolina Black Alliance | Jovita Lee<br>North Carolina Black Alliance<br>205 FAYETTEVILLE ST STE 220<br>RALEIGH, NORTH CAROLINA 27601<br>UNITED STATES<br>jovita@ncblackalliance.org | |
| NORTH CAROLINA | Keith Larick<br>NORTH CAROLINA FARM | |

| | | |
|---|---|---|
| FARM BUREAU FEDERATION | BUREAU FEDERATION<br>244 Marsh Landing Dr<br>Holly Springs, NORTH CAROLINA 27540<br>UNITED STATES<br>keith.larick@ncfb.org | |
| North Carolina Interfaith Power & Light | Susannah Tuttle<br>North Carolina Interfaith Powe<br>North Carolina Interfaith Power & Light<br>27 HORNE ST<br>RALEIGH, NORTH CAROLINA 27607<br>UNITED STATES<br>susannah@ncipl.org | |
| NRG Business Marketing LLC | Jennifer Hsia<br>Managing Senior Counsel<br>NRG Energy<br>804 Carnegie Center Dr.<br>Princeton, NEW JERSEY 08540<br>UNITED STATES<br>Jennifer.Hsia@nrg.com | Kevin Frank<br>Sr. Attorney<br>NRG Energy, Inc.<br>804 Carnegie Center<br>Princeton, NEW JERSEY 08540<br>kevin.frank@nrg.com |
| NRG Business Marketing LLC | | Heather Caporale<br>Compliance Analyst<br>NRG Energy, Inc.<br>804 Carnegie Center<br>Princeton, NEW JERSEY 08540<br>Heather.Caporale@nrg.com |
| Patriots Energy Group | Philip Mone<br>Attorney<br>McCarter & English, LLP<br>1301 K Street NW<br>Ste 1000 West<br>WASHINGTON, DISTRICT OF COLUMBIA 20005 | Michael E. Enoch<br>Executive Director<br>Patriots Energy Group<br>PO Box 220<br>ROCK HILL,DISTRICT OF COLUMBIA 29706-0220<br>mike.enoch@patriotsenergy.com |

| | | |
|---|---|---|
| | UNITED STATES<br>pmone@mccarter.com | |
| Philadelphia Gas Works | Andrea Sarmentero Garzon<br>Duncan, Weinberg, Genzer &<br>Pembroke, P.C.<br>1667 K Street, N.W.<br>Suite 700<br>Washington, DISTRICT OF<br>COLUMBIA 20006<br>UNITED STATES<br>asg@dwgp.com | Raquel Guzman<br>General Counsel<br>Philadelphia Gas Works - Legal<br>Department<br>800 W MONTGOMERY AVE<br>PHILADELPHIA, PENNSYLVANIA<br>19122<br>Raquel.Guzman@pgworks.com |
| Philadelphia Gas Works | Joel Greene<br>Duncan, Weinberg, Genzer &<br>Pembroke, P.C.<br>1667 K ST NW STE 700<br>WASHINGTON, DISTRICT OF<br>COLUMBIA 20006<br>UNITED STATES<br>jlg@dwgp.com | Ryan Reeves<br>Director of Gas Supply<br>Philadelphia Gas Works<br>800 W. Montgomery Ave.<br>PHILADELPHIA, PENNSYLVANIA<br>19122<br>Ryan.reeves@pgworks.com |
| Philadelphia Gas Works | Kevin Kurzeja<br>Duncan Weinberg Genzer &<br>Pembroke, PC<br>1667 K Street, NW<br>Suite 700<br>Washington, DISTRICT OF<br>COLUMBIA 20006<br>UNITED STATES<br>KMK@dwgp.com | |
| Piedmont Environmental Alliance | Jamie Maier<br>Executive Director<br>Piedmont Environmental Alliance<br>426 Old Salem Rd<br>Winston-Salem, NORTH<br>CAROLINA 27101 | |

| | UNITED STATES<br>jamie@peanc.org | |
|---|---|---|
| Piedmont Natural Gas Company, Inc. | Mary-Kate Rigney<br>Troutman Pepper Hamilton Sanders LLP<br>301 S. College St.<br>34th Floor<br>CHARLOTTE, NORTH CAROLINA 28202<br>UNITED STATES<br>mary-kate.rigney@troutman.com | Molly Suda<br>Associate General Counsel<br>Duke Energy Corporation<br>1301 PENNSYLVANIA AVE NW STE 200<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>molly.suda@duke-energy.com |
| Piedmont Natural Gas Company, Inc. | Sarah Stabley<br>Managing Director of Gas Suppl<br>Duke Energy Corporation<br>550 S. Tryon Street<br>DEC45A<br>CHARLOTTE, NORTH CAROLINA 28202<br>UNITED STATES<br>sarah.stabley@duke-energy.com | Jeff Patton<br>Manager – Gas Origination<br>525 South Tryon Street<br>DEP 18-A<br>Charlotte, NORTH CAROLINA 25202<br>jeff.patton@duke-energy.com |
| Piedmont Natural Gas Company, Inc. | | William Simmerson<br>Associate General Counsel<br>Duke Energy Corporation<br>411 Fayetteville Street<br>Raleigh, NORTH CAROLINA 27601<br>william.simmerson@duke-energy.com |
| Pittsylvania County Branch of the NAACP | Anita Royston<br>President<br>Pittsylvania County Branch of the NAACP<br>PO Box 1072<br>Chatham, VIRGINIA 24531<br>UNITED STATES<br>naacppittsyco@gmail.com | |

| | | |
|---|---|---|
| Pittsylvania County, Virginia | Matthew Evans<br>Gravitt Law Group, PLC<br>75 Maple Ave<br>Halifax, VIRGINIA 24558<br>UNITED STATES<br>matt@gravittlaw.com | Jeremy R. Swindlehurst<br>County Attorney<br>Gravitt Law Group, PLC<br>75 Maple Ave<br>Halifax, VIRGINIA 24558<br>jeremy@gravittlaw.com |
| Property Rights and Pipeline Center | Rebekah Sale<br>Property Rights and Pipeline C<br>40 W 37TH ST RM 1000<br>NEW YORK, NEW YORK 10018<br>UNITED STATES<br>rebekahsale@pipelinecenter.org | |
| PSEG Energy Resources & Trade LLC | Uju Okasi<br>Associate Counsel - Regulatory<br>601 New Jersey Ave., N.W<br>Suite 310<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>obianuju.okasi@pseg.com | Ana Murteira<br>Associate Regulatory Counsel<br>PSEG Services Corporation<br>80 PARK PLZ # T10<br>NEWARK, NEW JERSEY 07102<br>ana.murteira@pseg.com |
| PSEG Energy Resources & Trade LLC | | Stephen Irons<br>PSEG Energy Resources & Trade LLC<br>80 PARK PLZ<br>NEWARK, NEW JERSEY 07102<br>stephen.irons@pseg.com |
| PSEG Energy Resources & Trade LLC | | Priya Patel<br>80 PARK PLZ<br>NEWARK, NEW JERSEY 07102<br>priya.patel@pseg.com |
| PUBLIC CITIZEN, INC | Tyson Slocum<br>Energy Program Director<br>PUBLIC CITIZEN, INC<br>215 PENNSYLVANIA AVE SE<br>WASHINGTON, DISTRICT OF | |

| | | |
|---|---|---|
| | COLUMBIA 20003<br>UNITED STATES<br>tslocum@citizen.org | |
| Santee Cooper | Megan Driggers<br>Attorney<br>Santee Cooper<br>1 RIVERWOOD DR<br>MONCKS CORNER, SOUTH<br>CAROLINA 29461<br>UNITED STATES<br>megan.driggers@santeecooper.com | Stephen R. Pelcher, ESQ<br>Deputy General Counsel<br>SANTEE COOPER PUBLIC<br>SERVICE AUTHORITY<br>PO Box 2946101<br>MONCKS CORNER,SOUTH<br>CAROLINA 29461-6101<br>srpelche@santeecooper.com |
| Shell Energy<br>North America<br>(US), L.P. | Kevin Sweeney<br>Law Office of Kevin M. Sweeney<br>1717 K Street, NW<br>Suite 900<br>Washington, DISTRICT OF<br>COLUMBIA 20006<br>UNITED STATES<br>ksweeney@kmsenergylaw.com | Jennifer Fletcher<br>Director, Regulatory Affairs<br>Shell Energy North America (US),<br>L.P.<br>1050 K St NW<br>Washington, DISTRICT OF<br>COLUMBIA 20001<br>jennifer.fletcher@shell.com |
| Sierra Club | Elizabeth(Elly) Benson<br>Sierra Club<br>2101 Webster Street<br>Suite 1300<br>Oakland, CALIFORNIA 94612<br>UNITED STATES<br>elly.benson@sierraclub.org | |
| South Carolina<br>Interfaith Power<br>& Light | Robert Reese<br>8 BAXTER ST<br>GREENVILLE, SOUTH<br>CAROLINA 29607<br>UNITED STATES<br>rreese4@bellsouth.net | |
| Southern Alliance<br>for Clean Energy | Maggie Shober<br>Southern Alliance for Clean<br>Energy | Gary Purgason<br>Good Stewards of Rockingham<br>Southern Environmental Law Center |

| | | |
|---|---|---|
| | PO Box 1842<br>Knoxville, TENNESSEE 37901<br>UNITED STATES<br>maggie@cleanenergy.org | 790 STONE MOUNTAIN RD<br>STONEVILLE, NORTH CAROLINA 27048<br>1goodolefarmer@gmail.com |
| Southern Alliance for Clean Energy | | Gregory Buppert<br>Senior Attorney<br>Southern Environmental Law Center<br>120 Garrett Street<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA 22902<br>gbuppert@selcva.org |
| Southern Alliance for Clean Energy | Elizabeth Putfark<br>Southern Alliance for Clean Energy<br>120 Garrett Street<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>eputfark@selcva.org | |
| Southern Alliance for Clean Energy | Maggie Shober<br>Southern Alliance for Clean Energy<br>PO Box 1842<br>Knoxville, TENNESSEE 37901<br>UNITED STATES<br>maggie@cleanenergy.org | |
| Southern Alliance for Clean Energy | Shelley Robbins<br>Senior Decarbonization Manager<br>4231 AMERICAN DR APT B<br>DURHAM, NORTH CAROLINA 27705<br>UNITED STATES<br>shelley@cleanenergy.org | |

| | | |
|---|---|---|
| Southern Company Services, Inc. | Scott Grover<br>Balch & Bingham LLP<br>1710 Sixth Ave. North<br>Birmingham, ALABAMA 35203<br>UNITED STATES<br>sgrover@balch.com | |
| Southern Company Services, Inc. | Scott Grover<br>Balch & Bingham LLP<br>1710 Sixth Ave. North<br>Birmingham, ALABAMA 35203<br>UNITED STATES<br>sgrover@balch.com | |
| Southwestern Virginia Gas Company | James McClain<br>Southwestern Virginia Gas Company<br>208 LESTER ST<br>MARTINSVILLE, VIRGINIA 24112<br>UNITED STATES<br>james@svg-us.com | |
| Sustainable FERC Project | Gillian Giannetti<br>Director and Senior Attorney, Natural Resources Defense Council<br>1152 15th Street, NW<br>Suite 300<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>ggiannetti@nrdc.org | |
| Transco Municipal Group | Philip Mone<br>Attorney<br>McCarter & English, LLP<br>1301 K Street NW<br>Ste 1000 West<br>WASHINGTON, DISTRICT OF | Arthur C Corbin<br>President and CEO<br>Municipal Gas Authority of Georgia<br>104 TownPark Drive<br>Kennesaw, GEORGIA 30144 |

| | COLUMBIA 20005<br>UNITED STATES<br>pmone@mccarter.com | Multnomah<br>acorbin@gasauthority.com |
|---|---|---|
| Transco<br>Municipal Group | James Byrd<br>McCarter & English, LLP<br>1301 K Street N.W.<br>Suite 1000 West<br>Washington, DISTRICT OF<br>COLUMBIA 20005<br>UNITED STATES<br>jbyrd@mccarter.com | |
| Transcontinental<br>Gas Pipe Line<br>Company, LLC | Andre Pereira<br>Manager, Cert., Modernization<br>The Williams Companies, Inc.<br>2800 Post Oak Blvd<br>Houston, TEXAS 77056<br>UNITED STATES<br>andre.s.pereira@williams.com | Antauis Byrd<br>Regulatory Analyst<br>Transcontinental Gas Pipe Line<br>Company, LLC<br>2800 Post Oak Blvd<br>Houston, TEXAS 77056<br>antauis.byrd@williams.com |
| Transcontinental<br>Gas Pipe Line<br>Company, LLC | | Jasmine C. Turner<br>Sr. Regulatory Analyst<br>The Williams Companies, Inc.<br>2800 POST OAK BLVD<br>HOUSTON, TEXAS 77056<br>jasmine.turner@williams.com |
| Transcontinental<br>Gas Pipe Line<br>Company, LLC | | Travis Beach<br>Regulatory Analyst, Senior<br>The Williams Companies, Inc.<br>P.O. Box 1396<br>HOUSTON, TEXAS 77251<br>travis.beach@williams.com |
| Transcontinental<br>Gas Pipe Line<br>Company, LLC | | Moe Daraiseh<br>Sr. Regulatory Analyst<br>The Williams Companies, Inc.<br>2800 POST OAK BLVD |

| | | |
|---|---|---|
| | | HOUSTON, TEXAS 77056<br>Moe.Daraiseh@williams.com |
| Transcontinental Gas Pipe Line Company, LLC | | Bela Patel<br>Director – Rates & Regulatory<br>Williams Companies Inc<br>PO BOX 1396<br>HOUSTON, TEXAS 77251<br>bela.patel@williams.com |
| Transcontinental Gas Pipe Line Company, LLC | | Nicole M Turpen<br>Transcontinental Gas Pipe Line Company, LLC<br>2800 Post Oak Blvd<br>Houston, TEXAS 77055<br>nicole.turpen@williams.com |
| Transcontinental Gas Pipe Line Company, LLC | | Francesca Ciliberti<br>Senior Counsel<br>Transcontinental Gas Pipe Line Company, LLC<br>2800 Post Oak Blvd<br>Houston, TEXAS 77056<br>francesca.ciliberti-ayres@williams.com |
| Transcontinental Gas Pipe Line Company, LLC | | Stephen Andrew Hatridge, ESQ<br>VP & Assistant General Counsel<br>Transcontinental Gas Pipe Line Company, LLC<br>2800 Post Oak Blvd<br>P.O. Box 1396<br>Houston, TEXAS 77056<br>stephen.a.hatridge@williams.com |
| Transcontinental Gas Pipe Line Company, LLC | | Shauna Akers<br>2800 Post Oak Blvd 6th<br>Houston, TEXAS 77056<br>shauna.akers@williams.com |

| | | |
|---|---|---|
| Transcontinental Gas Pipe Line Company, LLC | | JOsh Henry<br>josh.henry@williams.com |
| Transcontinental Gas Pipe Line Company, LLC | | Joseph E Dean<br>Environmental Scientist<br>PO Box 1396<br>, 77251-1396<br>joseph.dean@williams.com |
| Virginia Manufacturers Association | Brett Vassey<br>President & CEO<br>Virginia Manufacturers Association<br>2112 W LABURNUM AVE STE 205<br>RICHMOND, VIRGINIA 23227<br>UNITED STATES<br>bvassey@vamanufacturers.com | |
| Virginia Natural Gas, Inc. | Elizabeth Wade<br>Senior Counsel<br>Southern Company Gas<br>10 PEACHTREE PL NE<br>ATLANTA, GEORGIA 30309<br>UNITED STATES<br>ferclegal@southernco.com | |
| VIRGINIA OIL & GAS ASSOCIATION, INC. | Dylan Bishop<br>Senior Vice President<br>901 E CARY ST STE 102<br>RICHMOND, VIRGINIA 23219<br>UNITED STATES<br>dbishop@wilsavconsulting.com | |
| Welfare Baptist Church (Ankoma Anderson, Senior Pastor) | Ankoma Anderson<br>Welfare Baptist Church<br>2176 BOLT DR<br>BELTON, SOUTH CAROLINA 29627 | |

| | UNITED STATES<br>aanderson@welfarebc.net | |
|---|---|---|